**KANSAS CITY POWER & LIGHT CO. v. NATIONAL LABOR RELATIONS BOARD (ASSOCIATION OF EMPLOYEES OF KANSAS CITY POWER & LIGHT CO., Intervener).**

No. 445.

Circuit Court of Appeals, Eighth Circuit.

April 25, 1940.

Rehearing Denied May 21, 1940.

Irvin Fane, of Kansas City, Mo. (Thad B. Landon, Ludwick Graves, and Johnson, Lucas, Landon, Graves & Fane, all of Kansas City, Mo., on the brief), for petitioner.

Fred Ruark, of Kansas City, Mo. (Ruby D. Garrett, of Kansas City, Mo., on the brief), for intervener.

Samuel Edes, of Washington, D. C. (Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, Laurence A. Knapp, Asst. Gen. Counsel, and Mortimer B. Wolf and David Persinger, all of Washington, D. C., on the brief), for respondent.

Before STONE, SANBORN, and THOMAS, Circuit Judges.

STONE, Circuit Judge.

This is a petition for review of an order by the National Labor Relations Board requiring petitioner to withdraw recognition from and to disestablish the Association of Employees of the Kansas City Power and Light Company as a bargaining agent for the employees; to cease and desist from giving effect to a contract between it and the Association (governing wages, hours of employment and working conditions); to pay back to the members of the Association dues deducted from wages for the use of the Association; to offer to Clyde Acock transfer to his former position in the Northeast power plant, without prejudice to seniority and other rights and privileges; to reinstate Thomas H. Gregg and Carl J. Nordstrom without prejudice to seniority, etc., and to make them whole for any loss of pay from date of discharge; to offer reinstatement (under conditions set forth) and to make whole losses in pay to eight other named employees; to post certain notices; and to give notice to the Board of compliance. Also, the order dismissed a petition of the Association for investigation and certification of representatives. The answer of the Board seeks enforcement of the order. The Association was accorded intervention both before the Board and here.

I. Validity of the Association.

The complaint charged petitioner with fostering, encouraging, sponsoring, dominating and interfering with the "formation of a labor organization known as 'Employees Representation Plan' [called Plan hereinafter] and its successor, 'The Association of Employees of Kansas City Power and Light Company' [called Association hereinafter]", and with giving financial and other support thereto.

The Board found (a) that the Plan was company initiated, promoted and supported; (b) that the Association was a continuation (in somewhat different form) of the company dominated Plan; (c) that there was company interference and domination in the formation and administration of the Association.

(a) Domination of the Plan.

The evidence is not only substantial but is convincing that the Plan was company conceived, initiated, promoted and financially supported. While entirely lawful until the National Labor Relations Act became effective, it was clearly unlawful thereafter.

(b) Association as Continuation of Plan.

It is necessary to outline briefly the history of the Plan and of the Association. As early as the latter part of 1931 and continuously up to the hearing on the complaint, petitioner employed undercover men who were to report upon matters they observed while working with and as employees. Among other things, they reported upon the labor activities which they observed.

In August, 1933, an American Federation of Labor Union began a drive to organize certain of the powerhouse workmen. This movement met rather ready response from the men. This continued for some weeks until the Plan took control and put an end thereto. During September, 1933, petitioner had its attorneys draw up the Plan. September 30, 1933, petitioner submitted the Plan in explana-

tory letters sent its employees. The Plan divided the employees into "departments" with departmental councils and a general council—each council was made up of equal representation of petitioner ' and of the employees. There were no dues. Secretaries for the councils were appointed by and paid by petitioner. Membership in the Plan seems to have been compulsory, or, at least, it worked out that way. In connection with the Plan, petitioner established a Director of Employees Relations who acted as chairman at the meetings of the joint representatives under the Plan and seems to have been the active constant agency of petitioner in maintaining proper touch with the employees. Alec E. Bettis acted throughout as this director.[1] Petitioner's answer to the complaint admits that it contributed by paying for printing the Plan and by paying the wages of the employee representatives while engaged in performing their duties under the Plan. The evidence leaves no doubt that the Plan was initiated, promoted and, so far as necessary, financed by petitioner.

The Plan functioned until April 12, 1937, when the validity of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., was upheld. National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352. It was not formally abandoned until the constitution of the Association was ratified by two-thirds of the chapters of the Association between June 23 and July 1, 1937. No meetings were held during April or thereafter. The labor matters seem to have lain dormant without action by petitioner or the employees until May 29, 1937. Apparently, both petitioner and at least some of the employees recognized that the Plan was not valid under the Act.

On May 29, 1937, W. R. Kent, who had been an employee for 21 years and was then a "trouble man"[2], acted. Kent had been considering the situation since early in May. Some years before he had, as he thought, an unfair experience while a member of a local of the A. F. of L. Recently, he had been threatened with violence by members of the C. I. O. He resolved to try to form an independent union of all of the employees, below supervisors, of petitioner. He made some inquiry among the employees and thought them favorable to the idea. May 29th he started to put his idea into execution. First, he told the head of his department (Dysart) of his intentions. Dysart refused to discuss the matter saying the men were free to do as they pleased without danger to their status. Kent asked Dysart if he had any objection to his taking up the matter with Mr. Bettis and asked him to make an appointment with Bettis. Dysart said he had no objection but Kent would have to make his own appointment with Bettis.

Kent then called a fellow workman, Hamarstrom, to whom he communicated his plan. They called on Bettis. Kent told Bettis that he was under the impression that the "old Plan was dead"; that he intended to form a new union; and asked Bettis (who was vice-president of his department) to call a "meeting of the employees under the old representation Plan for the purpose of disbanding that organization." Bettis refused to call a meeting or to have anything to do with the matter, saying that "as far as he was concerned, the Association [Plan] ceased to exist"; for Kent not to discuss it with him and that Kent was free to join any union he wanted to "the C. I. O., the A. F. of L., or anything else." Bettis said "he did not want us to use company time, hold any meetings on company property, or expect any legal advice from the legal department, or assistance from the company in any manner."

Later in the same day, Kent and Hamarstrom went to the law office of Col. Garrett, a friend of Kent, and told him they wanted a constitution drawn up for

---

[1] There is much testimony concerning the Plan and its operation but the Plan is not in the transcript here. What the Plan was must be drawn entirely from testimony about it.

[2] The duties of a trouble man are to remain at a company garage and from there take care of emergency calls, repairing of lines, repairing hot water heaters, electric ranges, replacing fuses, collecting bills, disconnecting and connecting services for the service department, switching, general repair work to the system and credit for the collection department.

a new union. They had with them a copy of the Plan and either had or sent for copies of several constitutions of independent unions, including that of the Association of Plant Employees of the Southwestern Bell Telephone Company. Mr. Ruark, partner of Garrett, took charge of the matter. He was told to draw up a constitution following the Telephone employees plan.[3] About noon next day, the draft was completed and was taken to a printer who delivered 3,000 copies several days later. Kent had blank membership cards printed, which were delivered May 29th or 31st, probably on the 31st.

June 1st, after work hours, Kent had two young women[4] run off copies of the constitution on a "ditto" machine belonging to the company. There is testimony that this machine was used by the "employees" but whether this was for their own private purposes or only on company business is not clear. This work and the stationery were paid for by Kent.

Kent and Hamarstrom called a meeting of the employee representatives under the Plan for the evening of June first at a place removed from company property. A majority of such representatives as well as several other employees (including Kent and Hamarstrom) attended. The idea of the new union and the proposed constitution were submitted and discussed. There was determined opposition to the entire matter by representatives of the

---

[3] Comparison of the constitutions of the Association and of the employees of the Telephone Company convinces that the constitution of the Telephone Company was closely followed in the draft of the constitution for the Association. In many provisions the language is identical.

Only four material differences exist.

One of these is the mechanics' of the organization. The Telephone plan could not be followed because it related to a differently organized business extending over a much larger area (Western Missouri and Kansas). Under the Telephone constitution, there were three units: chapters, divisions (larger than chapters) and areas with councils for each. The Association had chapters (within which were divisions) and a general council. While the old Plan is not in this record, we infer that this set up in the Association of chapters (including divisions) and general council followed that under the Plan of department organization and a general committee. Under the telephone arrangement, ten or more employees "of one or more occupations in the same exchange or in the same district or its equivalent" might form a chapter. Under the Association, chapters were based upon occupations with a definitely stated number of chapters and classification of occupations—where there were different occupations within a chapter, each constituted a "division" which selected a fixed number of members of the chapter committee.

A second difference lay in the method of selecting representatives. In the Telephone plan, the elected chapter chairman, vice-chairman and secretary constituted the chapter committee; the division council consisted of the chairman of chapters; the area council consisted of chairmen of divisions. In the Association, each division elected a fixed number of chapter committeemen and the entire chapter elected one member of the general council.

A third difference lay in the financial affairs. In the Telephone plan, the chapter was the basic unit to which dues were paid and by which assessments were made; while both division and area councils could levy dues or assessments, this could be done only when authorized by the chapters—the usual procedure for payment of division and of area expenditures was by levies on the chapters based on membership therein. In the Association, the dues were purely to the Association.

The fourth difference related to the adoption of the constitutions. In both the Telephone and the Association, was an identical (in effect) provision that ratification by two-thirds of the chapters which were functioning under the respective existing Plans should constitute adoption. The Association contained additional provisions as follows: "and adoption shall constitute a reorganization of those councils as chapters of this Association. The committeemen and councilmen now serving under The Employes Representation Plan shall serve as committeemen and councilmen of this Association, until their successors can be elected, and when this constitution is adopted, the said Employes Representation Plan shall cease to exist."

[4] One of these was stenographer for the superintendent of the "Overhead" Department in which Kent was employed. The work of the other young woman is not shown. Neither was a witness.

two councils [5] from the power plant departments.

Apparently, the others approved.

From this meeting until organization of the chapters, there was an intensive membership campaign. With the exception of one instance, none of the solicitors acted on company time or property—two men were thus solicited while they were working with the solicitor but without knowledge of any superior. There was some solicitation of men out on line jobs on streets when the solicited were on company time. There were several instances of men asking for membership applications and filling them out during working hours. Apparently, most of the solicitation and filling out of application was off company property and out of hours. During this solicitation period, various meetings were held by those active in organizing work. These meetings were at night at the homes of employees.

The applications for membership contained an approval of the constitution. The constitution provided that the employee representatives under the Plan should serve "until their successors can be elected" under the Association. On June 15, 1937, six of such representatives on the General Council (under the Plan) sent a letter to Porter, president of petitioner, that the Association had secured 1,263 members—more than 51% of the total employees—and requested a conference and recognition as sole bargaining

---

[5] The constitution of the Association provided for nine chapters (corresponding to the councils under the Plan) with divisions therein, as follows:

| | "Number of Committeemen | Representatives on General Council |
|---|---|---|
| **Chapter A.** | | |
| Northeast / Sub. 'Q.' | 4 | 1 |
| **Chapter B.** | | |
| Grand Avenue / Heating Station No. 2 / 2nd and Delaware / Central Station / Main Office Bldg., Engineers | 3 | 1 |
| **Chapter C.** | | |
| Eastern District | 2 | |
| Ottawa and Elkhart | 1 | |
| Overland Park—monthly | 1 | 1 |
| Overland Park—hourly | 1 | |
| **Chapter D.** | | |
| Lamp & Merchandise Sales | 2 | |
| Power and Lighting Sales | 1 | 1 |
| Personnel / Treasury Dept | 1 | |
| **Chapter E.** | | |
| Office Building | 1 | |
| Warehouse | 1 | 1 |
| Merchandise Stores / Meter Reading | 1 | |

| | "Number of Committeemen | Representatives on General Council |
|---|---|---|
| **Chapter F.** | | |
| Customers' Accounts / Collection Department / Credit Department | 2 | |
| Investment Department / Accounting Department / Stores Accounting / Purchasing / Miscellaneous | 2 | 1 |
| **Chapter G.** | | |
| Overhead | 3 | |
| Trouble | 1 | 1 |
| **Chapter H.** | | |
| Engineering & Merchandising / Substation | 1 | |
| Statistical / Maintenance | 1 | |
| Steam Distribution / Load Dispatcher | 1 | 1 |
| Service / Underground | 1 | |
| **Chapter I.** | | |
| Meter—Inside / Transformer | 1 | |
| Outside—Meter | 1 | 1 |
| Steam & Bldg. Maintenance / Transportation | 2 | |

Chapters A and B were the powerhouse employee chapters.

agent. Porter replied agreeing to a conference at the convenience of the representatives.

These organizing activities continued and finally resulted in meetings at which the various chapters were separately organized, the constitution adopted, formally, and the various chapter and General Council committeemen elected. All of the nine chapters were thus organized between June 23rd and July 1st, except Chapters A and B (which covered the powerhouse workers). These chapter meetings were in public halls at night.

Members of the General Council elected by the above seven chapters met and organized as such the evening of July 2, 1937, at a hotel. A resolution was passed, as follows:

"Resolved, that the members of this Council, or a majority thereof, make an effort to have a conference with Mr. Joseph F. Porter, President of the Company, Saturday morning, July 3, 1937, for the purpose of negotiating a contract between this Association and the Company, covering the following points generally: .

"1. That this Association be recognized by the Company as the sole bargaining agency for all of the employees of the Company up to, but not including, those holding supervisory positions.

"2. That the Company recognize seniority rights in each line of employment, based on length of service in said line of employment.

"3. That the Company install the so-called check-off system for the collection of membership dues from members of this Association and that a reasonable compensation be paid the Company for such service.

"4. That the Company recognize the principle of the closed shop, with the matter being placed before the Association membership at an election to be held within thirty (30) days from the date of the temporary agreement with the Company. Two-thirds (⅔) vote of the membership

of the Association being necessary to decide."

In pursuance of the resolution, a meeting was requested by the Council and held with Porter on July 3, 1937. This meeting resulted in recognition of the Association and in a temporary contract which was to be expanded into a more complete and detailed agreement. July 7, 1937, the General Council ratified the above temporary contract and appointed a Negotiating Committee to carry through the arrangement. After extended negotiations between this committee and petitioner, a definite contract was entered into on September 23, 1937, under which the Association and petitioner have since acted.

Under the above recital of fact situation, it is clear that the Association was the successor of the Plan. By the very terms of the Association constitution [6], the Plan was to "cease to exist" only when the constitution "is adopted" and such adoption was to be effective only when the constitution had "ratification by two-thirds of the chapters which were functioning as Councils under the Employes Representation Plan, heretofore in effect." Also, such "adoption shall constitute a reorganization of those Councils as Chapters of this Association"—plainly implying that the councils continued until the ratification of the constitution. Also, "the Committeemen and Councilmen now serving under the Employes Representation Plan shall serve as Committeemen and Councilmen of this Association, until their successors can be elected"—such elections could not be held until the various chapters met and organized under the Association. The purpose and the effect of these provisions in the Association constitution were to prevent any hiatus between the Plan and the Association.

It is true that the principal organizers of the Association as well as the company officials regarded the Plan as "dead" because of the effect thereon of the National Labor Relations Act. However, there is no evidence that the great body of employees so regarded the situation. Even though re-

[6] Article XI "Amendments and Adoptions", section 2 of the Association constitution, is as follows:

"Section 2. Ratification by two-thirds of the chapters which were functioning as Councils under the Employes Representation Plan, heretofore in effect, shall be sufficient for the adoption of this Constitution; and adoption shall constitute a reorganization of those Councils as Chapters of this Association.

"The Committeemen and Councilmen now serving under the Employes Representation Plan shall serve as Committeemen and Councilmen of this Association, until their successors can be elected, and when this Constitution is adopted, the said Employes Representation Plan shall cease to exist."

quested to give notice that the Plan was defunct, the company had refused to take such action. This attitude of the company may have been prompted by the belief that it was improper (under the Act) for it to take any action connected with labor organization matters. However, it is not the motive influencing this company stand but the effect of such inaction upon the employees which is important in this situation. The very fact that a new association was being formed would naturally lead the employees to believe that a change from the Plan was being made but the very constitution of the new organization assured them that the Plan would continue until the new organization had been formed and the requisite number of chapter ratifications of the constitution had been secured.

■ Considering that the Plan was entirely company conceived and supported; that all employees were required to be and, apparently, were members thereof; that the Plan had been in operation for about four years; that it became inoperative solely because of the Act; that the attitude of the company to the effect that the Plan had become inoperative was not brought to the attention of the employees prior to or during the campaign period of organization of the Association; that the constitution of the Association expressly provided for interim continuation of the Plan and of the representatives of the employees thereunder, we cannot say that the Board had no basis in the evidence for its inference that the employees were not as free from the influence of this situation as the Act contemplates they must be in choosing their bargaining agent. The situation here seems directly ruled by National Labor Relations Board v. Newport News Shipbuilding & Dry Dock Co., 308 U.S. 241, 60 S.Ct. 203, 84 L.Ed. ——. Also, compare National Labor Relations Board v. Falk Corporation, 308 U.S. 453, 60 S.Ct. 307, 84 L.Ed. ——; National Labor Relations Board v.

Penn. Greyhound Lines, 303 U.S. 261, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307, and National Labor Relations Board v. Pacific Greyhound Lines, 303 U.S. 272, 58 S.Ct. 577, 82 L.Ed. 838.

(c) Interference as to Association.

In addition to finding the carrying over of the effect of the Plan into the Association, the Board found petitioner had interfered with the formation of the Association in other respects. [7] In view of the above conclusion that the Board is sustained as to the carrying over of influence from the Plan, no purpose is served in discussing these various matters set out in footnote 7. It is sufficient to state that this voluminous record has been studied and much of it gone over repeatedly and that not one of these matters has been neglected. If it were necessary to determine whether the company had interfered with formation and administration of the Association, aside from the situation created by the Plan, we would gravely doubt whether the Board could be sustained. As to some of these matters there is no substantial evidence while the force of some others is negligible. If there had been no Plan and this Association had had no predecessor, the things found by the Board would not have rested on substantial evidence.

II. Reimbursement for Check-Off.

Under the temporary contract of July 3rd, the company was required to deduct Association dues from the wages or salaries of members and to pay them over to the Association. This was done. Petitioner attacks the part of the order of the Board which requires it to reimburse such members for the dues so deducted. The Board contends that this requirement is "clearly designed to effectuate the policies of the Act" because the check-off was not assented to by such members and cannot be considered as having been given "to an organization formed in response to the employer's wishes and supported by it."

---

[7] Instances of such interference, as found by the Board, were: Lack of notice of abandonment of the Plan; solicitation of Association membership during hours, on company property, in presence of superiors; assembly of employees at Ottawa for solicitation; attempt to estop challenge of Association by the Independent Power House Workers; consultations of Kent and Hamarstrom with Bettis; activities of B. James George; hasty recognition of Association as bar-

gaining agent and signing contract of July 3.

Counsel for the Board, in their brief, argue in support of the above matters found by the Board and also others: that Kent's account is unlikely; statements of foremen as to company attitude; delay in conference with Independent Power House Workers; suspension by company of closed shop clause in contract of September 23 and acquiescence of Association officers therein.

■ There may be situations which would justify such an order. This is not one. The proposition for a check-off as a method of collecting dues originated with the Association, was opposed by the company and conceded only upon demand of the Association. Such dues were fixed solely by the Association and used solely in its activities. This is not an instance where the company initiated, formed and promoted an organization and assured its support through a check-off. It is an instance of the effect of a prior organization (the Plan) carrying over an influence which might affect the entire freedom of employees to choose their bargaining agent.

There is no testimony of any objection to the check-off system except that some members preferred to pay their dues direct. Where such desires were manifested, they were relieved from the check-off.

There is no basis in the evidence or in any situation revealed by the evidence for such an order. It has, under the circumstances here, no relation to the effectuation of any policies of the Act.

### III. Transfer of Clyde Acock.

On August 3, 1937, Clyde Acock, a machinist, was transferred from the Northeast power plant to the Baltimore Avenue plant. The Board found this transfer to be a discrimination against him because of his labor activities. The Board ordered "an immediate transfer to his former position in the Northeast plant, without prejudice to his seniority and other rights and privileges."

For sixteen years, Acock had been with the company. Apparently, he had been a satisfactory workman. During this time he had been stationed at the Northeast power plant, except for a time in 1922, when he worked on installation of some heaters at the Baltimore plant (but not on boilers). He was competent to work on boiler making but had never done so.

He had been active in labor organization work at the Northeast plant at various times for several years. He had been warned by several of his superiors that such activities of the men might get them into trouble and that he was being watched. He was the leader of opposition to the Association in so far as the power plant employees were concerned; in organization of the Independent Union of Power Workers, which was in June and July, 1937; and in organization of the local I. B. E. W., which succeeded the Independent upon its disbanding about August 2, 1937.

On August 3, 1937, he was transferred to the Baltimore Avenue power house—quite removed from the Northeast powerhouse, which is the principal power plant of petitioner. The Baltimore powerhouse is used for heating purposes. The boilers at Baltimore were old and much in need of rehabilitation. The work to be done there was boilermaker's work. At Northeast, Acock had been doing general repair maintenance work as a machinist with no labor work. At Baltimore, he did "all kinds of work, labor work; mostly boiler work." He had never done boiler work before although capable of doing so.

His rate of pay was the same but there was no overtime opportunity as there was at Northeast. His seniority rights were not affected but chances of promotion were, apparently, not so great.

It was his understanding when he went to the Baltimore plant that the detail was temporary. On December 1, 1937, he was instructed to start "punching the clock" at the Baltimore plant, which he construes as meaning a permanent transfer. The company contends the transfer is temporary but the work is not yet finished. He was yet there when his testimony was taken (January 11, 1938) and he thought then that the end of the work was not in sight.

■ The National Labor Relations Act gives the Board no supervisory powers over the conduct of a business by its own management. However, the Act does place upon every interstate business the restraint that, in the conduct of its business, it shall refrain from doing anything with the purpose and having the effect of interfering with the entire freedom of its employees in labor organization matters. Such purpose and effect may take various forms—such as discharge.

As to Acock, this transfer would naturally interfere with his opportunities to pursue his activities affecting the employees in relation to the local union, by removing him from contact with the larger body of the members and eligible employees. Whatever the effect, petitioner would have full right to transfer him to any work it wanted him to do unless the purpose of such transfer be such character of interference or be by way of discipline for his labor attitude or activities. Therefore, the real inquiry here is whether the transfer was simply for work purposes or whether the purpose or one purpose was so to interfere or so to discipline.

■ Considering that there is no evidence that there were not other qualified

men who could have been so transferred; that Acock had never done this sort of work before; that he was a long time employee with unblemished work record; that the change was to his disadvantage; that his prominence in labor activities among the powerhouse workers was known to petitioner; and that his removal from the Northeast plant, where the largest body of such workers were, was at a critical formative stage of powerhouse workers labor affairs, we cannot say that there was no substantial basis for the conclusion of the Board that the purpose—at least one purpose—of the transfer was to affect and interfere with labor activities. The issue here is not that a contrary conclusion might not reasonably have been reached but whether there was substantial evidence to support the conclusion reached and the order made thereon by the Board. We think there was such evidence.

## IV. Discharge of Thomas H. Gregg.

Petitioner discharged Gregg, a head boiler cleaner at the Northeast plant, on August 24, 1937. The Board found the discharge to be "because of his union membership and activity." It ordered reinstatement without prejudice to seniority or other rights and privileges and also reimbursement. Petitioner contends that Gregg quit instead of being discharged but, that if discharged, it was for cause.

Although there is evidence that Gregg quit, yet there is substantial evidence that he was discharged and we accept the view that he was discharged. Therefore, the issue is whether there was substantial evidence that the discharge was because of his labor activities.

Gregg had worked for petitioner twelve and one-half years continuously and for some time had been a head boiler cleaner at the Northeast plant. As such, he had a small gang of cleaners under him. Although he worked with the men "when necessary", he was a sort of gang foreman whose duty it was to see that the men in his gang did the work laid out by his superiors. He was one of, if not the oldest, in seniority in his class.

In June, 1937, he joined the Independent Union of Power Workers and remained a member until he joined the I. B. E. W. early in August, about the time the Independent disbanded. Several times, he had declined to join the Association when solicited by Kent and, possibly, by others. He was a charter member of the I. B. E. W. Local.

His own testimony is that he was not particularly active in labor matters; that he never attended a meeting of the Independent; and that his activities were mainly "talking" it "some" to the men at the powerhouse.

Johnson was his immediate superior. Prior to the day of discharge, three or four complaints had been made to Johnson, by Johnson's superiors, that Gregg did not keep his gang going, did not do enough work, loafed on the job, and sat down, smoked and talked during work. Johnson had informed and warned him of such complaints. Also, Johnson had found fault with Gregg loafing on the job and had reprimanded him therefor. Some of these occurrences were before 1937. In July, 1937, Johnson told Gregg that Johnson's superior had reported Gregg as found loafing and Gregg had admitted it to Johnson. This evidence as to the conduct of Gregg was not denied.

Several days prior to August 24, 1937, Gregg and a gang of four boiler cleaners had been put to work cleaning the superheater pipes of one of the boilers at Northeast plant. This work is difficult and trying. While cleaning the pipes, the men lie upon the warm pipes inside the boiler with little ventilation. They wear respirators for protection from the dust caused by cleaning. Under these conditions, it is impossible for the men to work continuously but they come out at intervals to rest and breathe fresh air. Only two men could work well in this boiler at a time. Gregg's method was to have two of the four men in his gang work while the other two rested. This was a proper procedure, although Essex (Chief Engineer in charge of the Northeast power plant) claims he was unfamiliar with it. It was recognized by Johnson as proper.

The morning of August 24, 1937, Gregg and two of his gang (who had come out for a rest) were outside the boiler talking while two men were inside the boiler.

During a round of inspection of the plant, Essex and Atherton (assistant to Essex) saw Gregg and the two men outside the boiler. After watching them for several minutes, they came over to the men. Gregg's account of what took place is as follows: Essex said to Gregg "What is going on?" Gregg told him "we were cleaning the heating tubes. He looked in the boiler, and turned around to me and said 'Every * * * time I come around here

there is nothing going on'." Gregg testified also that: "He [Essex] was very rough in his language, and he looked in the boiler and he said 'Those two men in there aren't working' * * *. I told him I thought they were." Also, Gregg testified that he could not see the men in the boiler from where he was. Essex testified the men in the boiler were not working and he saw no dust which would have been stirred up if the men had been working.

Essex and Atherton left and shortly Johnson had instructions to bring Gregg to the office of Essex, which he did. There is a sharp dispute as to some things which took place there. It is our duty to and we do accept the version given by Gregg, which is as follows: "Mr. Essex said, 'Gregg, I guess I am going to have to let you go'. I asked him if that was a fact, and he said it was. I said, 'Then the next thing is for you to have my time made out.' He says, 'Here is your time'—he extended his hand and says 'here is your time; it is all ready made out'."

The time slip had been made out before Gregg came to the office but was not signed until after the last-quoted statement by Gregg. Gregg then told Essex "he was lower than a snake" and after an exchange of heated words, Gregg was ordered from the office and went.

From the above evidence, the Board found: "The work inside the boiler is admittedly unpleasant and the difficult conditions under which it must be performed are such that the boiler cleaners must leave the inside of the boiler at frequent intervals in the course of their work on a particular boiler. In view of the type of work performed by the boiler cleaning crew and the conditions under which they work, as stated above, we find it incredible that Essex should want to discharge Gregg, who had worked for the respondent for 12 years, for the reasons assigned by Essex. The reports of the labor spies had informed the respondent of Gregg's union affiliation and activity. We are of the opinion that the respondent had already determined to discharge him prior to the incident of August 24, 1937, because of his union affiliation and activity, and that Essex arranged the interview in his office to give the appearance that Gregg was being discharged for unsatisfactory work. Under the circumstances, Gregg's request for his time slip did not constitute a voluntary quitting of employment, but was merely a request for the necessary papers to collect his wages after he knew that Essex was discharging him. It is clear that he was not discharged because of anything that took place in Essex' office. We find that the respondent discharged Gregg because of his union membership and activity."

The conclusion that Gregg was discharged because of his union activities has no substantial evidence whatsoever to support it. From the evidence, there is no basis for any rational conclusion except that the discharge was because Essex thought that Gregg—who several times before had (as his superiors thought) been found loafing—was doing so again. Gregg made no attempt to challenge the evidence that he had been warned and reprimanded for loafing theretofore or that, on one occasion, he had admitted to Johnson doing so. He made no challenge of the evidence that the two men in the boiler were not working, when Essex looked in. He merely told Essex "I thought they were", though he was where he could not see what they were doing and though it was his particular duty to see that the work was done. At the office, when Essex said: "Gregg, I guess I am going to have to let you go", Gregg offered no explanation nor made any denial of the incident which he must have known was the immediate cause of the trouble. The evidence of the previous record of Gregg and of the idleness of the men in the boiler is undisputed in this record and without attempt at explanation.

### Discharges of September 17 and October 4.

The Board found that three men (Embree, Hoge and Gamble) had been discharged on September 17, 1937, and five men (Hurst, O'Hara, Keir, Earickson and Winters) had been discharged on October 4, 1937, because of labor activities and ordered reinstatement to their former or to substantially equivalent positions or, if no such positions be available, then to any position for which they may be qualified, without prejudice to seniority and other rights and privileges—the method of effectuating such reinstatement was set forth in some detail. Reimbursement was ordered also. All of these men were members of the "labor gang" at the Northeast power plant.

Petitioner contended, and the Board found, "that a reduction in the number of employees in the gangs at the Northeast plant was necessary." The Board does not find that the number of men (including these men and others) discharged was not a proper reduction of this force for good reasons. It finds that there was discrimination in selection of the men to be discharged and that these men were so selected because of their labor activities.

The reasoning by which the Board reached the conclusion that these eight men were laid off because of membership and activity in the Brotherhood (International Brotherhood of Electrical Workers, Local Union B–412 of the A. F. of L.) is as follows: (a) petitioner was opposed to an "outside" union and knew that these men were members of the Brotherhood; (b) three of the men were advised by their superiors, shortly before lay off, to join the Association as a means of safeguarding their jobs—at the time of lay off, petitioner and the Association had entered into a closed shop agreement; (c) Association members with less seniority than some of these men were not laid off—only two Association members (Dunkin and Williamson) in the labor gang were laid off and they were promptly reinstated; (d) two Association members (Steigers and Spansbauer) of the labor gang were retained though less in seniority to some of these men; (e) there is no showing that these men could not have been placed in other departments, as were Dunkin and Williamson.

■ (a) There is substantial evidence to sustain this finding. Opposition to a union and discharges of employees who happen to be members are not enough to justify a finding of unfair practices under the Act unless such discharges are motivated by such opposition. Burlington Dyeing & Finishing Co. v. National Labor Relations Board, 4 Cir., 104 F.2d 736, 738, 739. The Board recognizes this rule and properly finds that the effect of such a situation is simply to "cast grave doubt upon the sincerity of the respondent in asserting that it selected these men for discharge solely because of a decrease in work." To state it otherwise, such a situation warrants a critical attitude and may justify unfavorable inferences where evidence is not clear as to whether there was discrimination or not because of such opposition.

■ (b) Three of these men (Embree, Keir and Winters) were advised to join the Association and told either that the petitioner favored the Association or that it would not recognize an outside union, by Carroll. Winters received similar suggestions from McCollom. These occurrences were from a few days to several weeks before discharge in the different instances. Carroll was a laborer who replaced his foreman when the foreman was absent. McCollom was an assistant engineer—the extent of his authority is not shown but it is presumable that he had supervisory authority over laborers when they were working in connection with the engines and boilers and men from the labor gang were sometimes assigned to such work. These statements of Carroll and of McCullom were merely suggestions taking the form of friendly advice. Such suggestions were not unnatural considering that the Association had voted for a closed shop and the petitioner had (July 3) agreed to the principle of a closed shop and later (September 23) made a contract to that effect with the Association. There is no evidence that petitioner authorized or even knew of such statements or of any other statements of like tenor. The supervisory character of these two men is too minor for such statements to be regarded as expressions of the management without some proof of knowledge or authorization thereof by the management. National Labor Relations Board v. Sands Mfg. Co., 306 U.S. 332, 341, 342, 59 S.Ct. 508, 83 L.Ed. 682.

(c)–(d). Since these two matters have to do mainly with seniority, they are better considered together.

■ So far as the Labor Relations Act is concerned, an employer may adopt any rule of seniority it may desire so long as the normal operation of the rule does not discriminate against employees in so far as their freedom to select their bargaining agency is involved. The administration of any rule of seniority must, of course, avoid such discrimination.

While the preliminary contract (July 3) with the Association recognized the "principle" of seniority, it contained no definition of seniority or any rule concerning its application. Until the con-

tract of September 23rd was executed, petitioner pursued the "practice" it had used prior to the Association. After September 23rd, petitioner applied the seniority rules of that contract. The above "practice" was that where "general conditions so far as skill and ability, adaptability for the work are equal, we always gave preference to the man with the longer service in the particular line of employment." There is no evidence as to whether such "longer service" meant continuous service or included all service (even though broken), except such as may be inferred from evidence as to the preference in hiring which was given to former employees.

Among other provisions as to seniority contained in the September 23rd contract, were the here pertinent ones as follows. In making reductions of force, that seniority should govern "provided the employees of seniority have good characters, and are capable, and have suitable ability"; that only length of service should determine seniority; that length of service should include any previous services not terminated by discharge or resignation; that seniority should be determined "by lines of employment, proper consideration to be given to departments."[8]

The main difference between the former "practice" and the above provisions of the contract is that the contract definitely provided that previous services (not terminated by discharge or resignation) counted in length of service estimates—a matter left indefinite in the evidence as to such calculations under the prior practice.

On September 15, 1937 (and presumably on the 17th) the labor gang contained eighteen men. Embree (a charter member of the I. B. E. W.) testified that all of them were members of the I. B. E. W. except Steigers, Spansbauer, Dunkin and Williamson. On September 17th, Embree, Hoge, Gamble, Dunkin and Williamson were laid off. None of these five men (possibly except Embree) claims any seniority over any man then retained in the labor gang. Embree claims a possible seniority over Steigers (retained). It is certain that Steigers had the longer continuous service. Embree's service was twice broken[9] and whether his entire service, including previous services in 1925 and in 1935, would exceed Steigers' is not clear from the evidence beyond the inference which may be drawn from the testimony of Embree that whether he had seniority over Steigers depended upon how seniority was figured and that there were several ways of doing that. Since this lay off was under the former "practice" of the company, the most we can do is to rely on the rather indefinite and tenuous evidence as to petitioner's custom in hiring and conclude that previous services were taken into account in estimating seniority. The results are that—as to priority in this lay off—the practice of petitioner was observed except as to Embree.

On October 4, 1937, the five others (Hurst, O'Hara, Keir, Earickson and Winters) were laid off. At that date, petitioner was under the September 23rd contract whereby seniority was calculated by adding previous services (not terminated by discharge or resignation). Applying this rule of seniority, the results as to seniority on that date were as follows. Hurst had seniority over Richie, Steigers and Spansbauer (all retained). O'Hara had seniority over Steigers and had equal seniority with Spansbauer (both having been employed on April 5, 1935). Keir had seniority over Steigers (retained). Neither Earickson nor Winters had seniority over any one retained in the labor gang when they were laid off. As to seniority of these five men, the net results are that Hurst, O'Hara and Keir had seniority over Steigers (retained) and Hurst had seniority also over Richie and Spansbauer (both retained).

The reasons given by petitioner for retaining Steigers were that he had had an eye injured during work but mainly that he was the only man in the labor gang who could operate a locomotive and crane. The injury reason is not sufficiently supported to constitute a good reason for preferring

---

8 While this contract rule of seniority was binding only upon the petitioner and members of the Association, yet it covered such members at Northeast plant; was the rule followed by petitioner; and any application of a more onerous rule to non-Association members would have been a discrimination and, if for labor activities, an unfair practice under the Act.

9 He served 6 months in 1925, six months beginning May 3, 1935, and was last employed April 1, 1936. He testified that when he was laid off in 1935, Steigers was retained.

him. The fact of injury is not challenged, but there is evidence that the injury was relatively slight and did not long or seriously interfere with his work. He was in employ of petitioner during the hearing but was not made a witness.

The other reason, that he was the only man on the labor gang who could operate a locomotive and a crane, was not seriously challenged and must be accepted as true. His original hiring was because of the need of a man having such ability. The seniority rule (under both the prior "practice" and the contract of September 23rd) allowed preference of men who had special abilities useful to the petitioner and not possessed by others of superior seniority. Petitioner had men who regularly operated locomotives and cranes but one of the main uses of the men in the labor gang was to relieve men in other work who might be away because of vacations, sickness or otherwise. There is no substantial evidence that the retention of Steigers over Hurst, O'Hara and Keir was not a legitimate application of the existing rule of seniority.[10]

The reason given by petitioner for preferring Spansbauer over Hurst (with superior seniority) and over O'Hara (with equal seniority) was that he was an expert boiler maintenance man and the only man in the gang who could operate a boiler. This reason is established by the evidence. While Keir was qualified to operate a boiler, he had had no experience with the boilers at this plant and was not familiar with the equipment, while Spansbauer had operated these boilers as well as others. There is no substantial evidence that this reason was not the real reason for such preference.

▇▇▇ Hurst had seniority over Richie (retained). The reasons given by petitioner for this preference of Richie were that he had had experience in condenser cleaning and was a more industrious worker. We need not examine the force of this reason. Even if it were insufficient (which we do not examine nor determine) yet this action of petitioner would not constitute an unfair practice under the Act. This is so because Richie was, like Hurst, a member of the I. B. E. W. There is no evidence that the respective union activities of the two men had any influence whatsoever. There is no substantial evidence that Richie was preferred over Hurst because of such membership.

Several of these five men were senior to Dunkin and Williamson who had been previously laid off on September 17th. Later, Dunkin and Williamson were reemployed in another department—the overhead department. The Board gives weight to this reemployment of these two Association men and draws therefrom the inference that such action serves to show improper lay off of the union men.

The story of these reemployments is told by Dunkin, a rebuttal witness for the Board, as follows: He was laid off September 17th. Apparently, the next day, Homer Beverlin, supervisor of the garage on Baltimore Avenue, advised him to see Tainter, an "estimator" and a member of the Association. The 18th, he called on Tainter who asked him "why I had gotten laid off, and well about what Mr. Essex had said when he laid me off, and things like that; and he wanted to know if I belonged to the Association and I told him * * * yes. And there wasn't much more said in his office at that time." Tainter saw him that night at his (Dunkin's) home and then advised him to write a letter to the company and helped him write it.[11]

---

[10] It should be stated that Steigers had much more seniority than any of these men if a previous employment, from 1915 to 1925, is included. Our reason for rejecting this inclusion is that there is testimony to the effect that this earlier employment was in a different department.

[11] The letter was as follows:

"Kansas City, Missouri
"September 18, 1937.

"Association of Employees of the Kansas City Power and Light Co.
"Mr. L. E. Stuckey, Committeeman
"Dear Sir:

"Please be advised that I was laid off by the Company September 17, 1937. I first went to work for the Company in April 1935 and was laid off in November 1935. I was rehired again in May 1936 and my employment was continuous until September 17, 1937.

"When Mr. Essex called me into his office to tell me of being laid off he informed me that my work had been satisfactory in every way and that he was sorry to let me go.

"During my employ I recently purchased a G. E. Refrigerator and a G. E. Sweeper which I have not quite finished paying for. I also have a Loan on my car from the Edison Credit Union. These purchases and the loan was made in the belief that my job was secure.

"Due to the scarcity of positions that pay a wage comparable to the one I had

Tainter told him to copy the letter and take it to Stuckey. Stuckey was a fireman at the Northeast plant and a committeeman of the Association chapter covering the Northeast plant and the representative of that chapter on the General Council of the Association. Later that night, he took the letter to Stuckey at his home. Afterwards, Stuckey called him and told him to go down to the office and "fill out an application". He did this. He and Williamson (who had written a short letter asking reinstatement on September 20th) were sent to Mr. Bettis, a vice-president over twelve departments (these departments employed about 900 men and included the overhead department but did not include the production department). Bettis was out and they did not see him until September 24th. Bettis looked at the applications and gave them a note to Mr. Cornelius, superintendent of the overhead department (having to do with the overhead wiring system). Cornelius looked at the applications and said "he would see if he couldn't make a place for us—that he would let us know." They saw Cornelius again on September 27th and he put them to work in his department, beginning September 29th.

From company witnesses, there is the further testimony that Stuckey took the letters to Essex (chief engineer at the Northeast station) and Essex told him he would see what he could do. Essex showed the letters to his superior (Keeth) and Keeth said he would see what he could do. Keeth talked to Shoemaker (his superior in charge of the production department and other departments) and, while there, Bettis came in and asked "if the men were all right—good workers"—he believed he could use them and to have them report to the record department. Thereafter, Keeth told Stuckey "to get in touch with the men and tell them to go to the employment department." Keeth regarded the matters "in the nature of a complaint" and it was handled in accordance with the contract with the Association.

There is no evidence that the above transactions were, directly or indirectly, a transfer of these men from the production to the overhead department. There is no evidence that these two men would not now be laid off had they not made application for reemployment and followed the matter through their regular representative of the Association, which the petitioner was then recognizing as the bargaining agent under a contract to that effect. There are no suspicious circumstances as to the course of these reemployment negotiations which involved the representative of the employees and four officials of the company and endured for about ten days. There is no substantial evidence to support the inference of the Board that these men were given preferential treatment.

(e) The Board drew an unfavorable inference from the reemployment of Dunkin and Williamson because (in addition to matters above examined) the company made no showing that it could not have placed the eight men, involved here, in other departments as it had Dunkin and Williamson. Had these two men been transferred, there would be force in this position. Also, if there were any substantial evidence that the lay off and reemployment were merely devices—resulting indirectly in a transfer—such force would be present. The difficulty is that there is no evidence casting doubt upon the reality and good faith of these two lay offs and rehirings.

The net result of the above consideration of the grounds for the order of the Board as to these eight men is that there is no substantial evidence as to discrimination against any of them because of union membership or activities. The findings and conclusions of the Board as to them cannot be accepted.

### Discharge of Nordstrom.

Carl J. Nordstrom was laid off on October 8, 1937. He then had seniority over W. Lovell. Both were in the Northeast plant labor gang at the time. Both were charter members of the I. B. E. W. The reasons advanced by petitioner for retaining Lovell were that he was an older man and would find difficulty in securing employment and that, if Nordstrom

with the company I stand to lose what I have invested. There is one other reason which makes my job of the utmost importance. We are expecting an arrival in our family this coming January.

"With the assurance from Mr. Essex that my work was satisfactory, the fact that I like my job, and that the Company has no employee who can be more loyal, I earnestly solicit the Association to intercede in my behalf for my reinstatement.

"Trusting the above information will aid you, I am,

"Yours Sincerely,

"L. E. Dunkin."

were retained, he would have had to take a reduction in wages and it was apprehended this would create bad feeling on his part. Neither one nor both of these reasons accord with a proper application of the seniority rule then in force. There is no basis for finding that the discrimination was because merely of membership in the I. B. E. W., since both were members and both charter members of that union. However, other evidence is sufficiently substantial to support the finding of the Board that Nordstrom was discriminated against because of his union activities.

Nordstrom was one of the oldest employees in the production department, having continuous service of nearly ten years. He held a unique position. He had been employed because of his special ability as a cement finisher. His main work was in cement maintenance and he was the only man so qualified. Besides this work, he did all kinds of repair work, including carpentry. Because of this special ability as a cement finisher he was paid seventy-two cents an hour while the labor gang received only sixty cents. When he was laid off, there was uncompleted cement finishing work such as he did. While some kinds of cement work was let by contract, it did not include the kind he had been doing for ten years. Several weeks before he was laid off, he was "demoted" to the labor gang. While he was there his higher wages continued. His superior testified he was not laid off to make the saving of the difference in wages. No complaint was ever made of his work. His superior testified that he had more ability than Lovell (retained).

■ This evidence and the lack of sufficient reasons for discriminating against him, leaves no sufficient evidence as to why he was laid off and Lovell retained. In this state of the evidence, the Board was justified (as stated earlier herein) in considering the attitude of petitioner toward outside unions. Compare National Labor Relations Board v. J. Freezer & Son, 4 Cir., 95 F.2d 840, 841, It was a fair conclusion that something in connection with his union activities had influenced the petitioner in its action.

### Notices.

A provision in the order of the Board requires petitioner to "immediately post notices in conspicuous places throughout its plants, buildings and other places of employment, and maintain such notices for a period of at least sixty (60) consecutive days, stating that the respondent will cease and desist in the manner set forth in 1 (a), (b), (c), and (d), and that it will take the affirmative action set forth in 2 (a), (b), (c), (d), (e), (f), and (g) of this order." The portions of the order referred to in the quotation are in the footnote.[12]

---

12 "1. Cease and desist from:

"(a) In any manner dominating or interfering with the administration of Association of Employees of the Kansas City Power and Light Company or with the formation or administration of any other labor organization of its employees, and from contributing support to Association of Employees of the Kansas City Power & Light Company, or any other labor organization of its employees;

"(b) In any manner giving effect to its contracts, heretofore described, with Association of Employees of the Kansas City Power & Light Company or to any other contract or agreement which it may have entered into with said Association in respect to rates of pay, wages, hours of employment, or other conditions of work;

"(c) Discouraging membership in International Brotherhood of Electrical Workers, Local Union B-412, or any other labor organization of its employees, by discharging, transferring to less favorable positions, or refusing to reinstate any of its employees, or in any other manner discriminating against its employees in regard to their hire or tenure of employment or any term or condition of their employment;

"(d) Either directly or indirectly engaging in any manner of espionage or surveillance, or engaging the services of any agency or individuals for the purposes of, or in any other manner interfering with, restraining, or coercing its employees in the exercise of the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, or to engage in concerted activities for the purposes of collective bargaining and other mutual aid or protection.

"2. Take the following affirmative action, which the Board finds will effectuate the policies of the Act;

"(a) Withdraw all recognition from Association of Employees of the Kansas City Power & Light Company as a representative of its employees for the purpose of dealing with the respondent, concerning grievances, labor disputes, wages,

Petitioner contends it cannot be required to post the notice ordered because such would be "to admit an infraction of the law" and it cannot be compelled to make such an admission.

■ We may accept the statement that no one can be compelled to admit commission of an illegal act. We need not resolve the proposition of whether such an order of the Board requires such an admission.[13] There is no such necessity because all that the substance of the order of the Board requires and all that need be done is to post notices in such form as "to convey to the employees the knowledge of a guarantee of an unhampered

---

rates of pay, hours of employment, or conditions of work, and completely disestablish Association of Employees of the Kansas City Power & Light Company as such representative;

"(b) Reimburse each of its employees who were members of Association of Employees of the Kansas City Power & Light Company for all the dues and assessments, if any, which it has deducted from their wages on behalf of Association of Employees of the Kansas City Power & Light Company;

"(c) Offer Clyde Acock an immediate transfer to his former position in the Northeast plant, without prejudice to his seniority and other rights and privileges;

"(d) Offer Thomas H. Gregg and Carl J. Nordstrom immediate and full reinstatement to their former or substantially equivalent positions, without prejudice to their seniority or other rights and privileges;

"(e) Offer John H. Earickson, William J. Embree, Matthew W. Gamble, Raymond Hoge, George W. Hurst, Donald M. Keir, John J. O'Hara, and Harry A. Winters, immediate and full reinstatement, without prejudice to their seniority and other rights and privileges, in the manner set forth in the section entitled 'Remedy' above, placing those employees for whom employment is not immediately available and those who, although reinstated, are reinstated not to their former or substantially equivalent positions but to positions for which they are qualified, upon a preferential list in the manner set forth in said section, and thereafter, in said manner, offer them employment as it becomes available;

"(f) Make whole Thomas H. Gregg and Carl J. Nordstrom for any loss of pay that they may have suffered by reason of their respective discharges by payment to each of them of a sum of money, equal to the amount which he would normally have earned as wages during the period from the date of his discharge to the date of the said offer of reinstatement, less his net earnings during said period; deducting, however, from the amount otherwise due to each of the said employees, monies received by said employee during said period for work performed upon Federal, State, county, municipal or other work-relief projects; and pay over the amount, so deducted, to the appropriate fiscal agency of the Federal, State, county, municipal, or other government or governments which supplied the funds for said work-relief projects;

"(g) Make whole John H. Earickson, William J. Embree, Matthew W. Gamble, Raymond Hoge, George W. Hurst, Donald M. Keir, John J. O'Hara, and Harry A. Winters for any loss of pay they, or any of them, may have suffered by reason of their respective discharges, by payment to them in the manner set forth in the section entitled 'Remedy' above; deducting, however, from the amount otherwise due to each of the said employees, monies received by said employee during said period for work performed upon Federal, State, county, municipal or other work-relief projects; and pay over the amount, so deducted, to the appropriate fiscal agency of the Federal, State, county, municipal or other government or governments which supplied the funds for said work-relief projects."

[13] As to this, there is a difference in the decisions. That it is or might be such a requirement is held in Swift v. National Labor Relations Board, 10 Cir., 106 F.2d 87, 94; Burlington D. & F. Co. v. National Labor Relations Board, 4 Cir., 104 F.2d 736, 739; National Labor Relations Board v. Nebel Knitting Co., 4 Cir., 103 F.2d 594, 595; National Labor Relations Board v. Louisville Ref. Co., 6 Cir., 102 F.2d 678, 681, certiorari denied, 308 U.S. 568, 60 S.Ct. 81, 84 L. Ed. ——; Virginia Ferry Corp. v. National Labor Relations Board, 4 Cir., 101 F.2d 103, 106; National Labor Relations Board v. Eagle Mfg. Co., 4 Cir., 99 F.2d 930, 932; Mooresville Cotton Mills v. National Labor Relations Board, 4 Cir., 97 F.2d 959, 963, 964; National Labor Relations Board v. A. S. Abell Co.; 4 Cir., 97 F.2d 951, 959.

Contra—National Labor Relations Board v. Falk Corp., 7 Cir., 102 F.2d 383, 390, Id., 308 U.S. 544, 60 S.Ct. 176, 84 L.Ed. —— (see same case 7 Cir., 106 F.2d 454, Id., 308 U.S. 544, 60 S.Ct. 176, 84 L.Ed. —— and Id., 308 U.S. 453, 60 S.Ct. 307, 84 L.Ed. ——).

right in the future to determine their own labor affiliation." National Labor Relations Board v. Falk Corp., 7 Cir., 102 F. 2d 383, 390, approved in 308 U.S. 453, 462, 60 S.Ct. 307, 84 L.Ed. —. This can be fully and accurately done by a notice containing a copy of the order of the Board—as modified by this opinion—with a clear statement that the order, as contained in the notice, has been approved by this court and that petitioner will, in all respects, comply therewith.[14]

Separate Intervener Contentions.

The intervener, Association, argues two particular matters not yet considered. One of these is that the intervener was denied a fair hearing in violation of the Fifth Amendment to the Constitution. The other is that the Board erred in dismissal of intervener's petition for investigation and certification of bargaining representatives (meaning the Association).

 As to fair hearing. The basis of this contention is not that the examiner, who heard the evidence, acted unfairly to the prejudice of substantial rights of intervener. As matter of fact, the examiner was commendably fair and impartial. The contention is that "The Board did not form an opinion based upon all of the testimony, as required by Section 10(c) of the Act, 29 U.S.C.A. § 160(c), which opinion was a basic condition precedent to making of findings and issuance of an order." While we do not sustain some of the findings and conclusions of the Board, because of insufficiency of evidence, yet we are unable to conclude that the Board did not consider all of the evidence or reached its findings and conclusions in conscious disregard of the evidence.

 As to dismissal of intervener's petition. The day prior to the hearings be-fore the examiner, intervener filed with the regional director a motion for leave to intervene in this proceeding and its proposed petition in intervention. Among other things, the intervening petition set forth that a question had arisen as to the bargaining agent for the employees of petitioner and, therefore, it prayed the holding of an election to determine that matter and, "to accomplish said purpose", attached to the petition a "Petition for Investigation and Certification of Representatives Pursuant to Section 9(c) of the National Labor Relations Act, 29 U.S.C.A. § 159(c)", wherein the intervener claimed to be a labor organization and to have a majority of the employees of petitioner and asked recognition as the sole bargaining agency for all employees except those in supervisory positions.

The director allowed intervention and participation "in the hearing * * * insofar as its interest may appear" but ordered "that no action be taken at this time on the Petition for Investigation and Certification" for four reasons set out.[15] After the hearings had continued several days, intervener called the Petition for Investigation and the ruling of the regional director to the attention of the examiner. The examiner declined to consider the matter as being outside his jurisdiction because of Section 19 of Article II of the Rules and Regulations of the Board—Series 1 as amended—which provided that the regional director should rule on all motions filed prior to hearing. In its "Decision and Order", the Board affirmed the ruling of the regional director and, further on in the order, dismissed the Petition for Investigation.

The contentions of intervener are that the dismissal deprives its members of the

[14] Notices substantially in this form have been prescribed in National Labor Relations Board v. Nebel Knitting Co., 4 Cir., 103 F.2d 594, 595; Virginia Ferry Corp. v. National Labor Relations Board, 4 Cir., 101 F.2d 103, 106; National Labor Relations Board v. Eagle Mfg. Co., 4 Cir., 99 F.2d 930, 932. For somewhat different forms see National Labor Relations Board v. Louisville Ref. Co., 6 Cir., 102 F.2d 678, 681; Mooresville Cotton Co. v. National Labor Relations Board, 4 Cir., 97 F.2d 959, 964; National Labor Relations Board v. A. S. Abell Co., 4 Cir., 97 F.2d 951, 959.

[15] Those reasons were as follows:
"1. The issues therein raised are now pending before the Board in the matter of Kansas City Power and Light Company and International Brotherhood of Electrical Workers, Local Union B-412, Case No. XVII-R-46, on which a hearing was held on September 24, 1937.

"2. The said Petition herein filed raises issues not raised in the Complaint herein.

"3. The National Labor Relations Board, which has the sole power to order an investigation on the petition, has not had an opportunity to consider the same.

"4. No opportunity has been given to give the respondent herein reasonable notice of a hearing on said petition."

benefits of Section 9(c) of the Act; that it denies them the privilege of selecting, in the manner prescribed in the act, a representative of their own choosing and prevented them from demonstrating to the Board that intervener "is without doubt the chosen representative of the great majority of the employees" of the company.

This Petition for Investigation came into this proceeding which was based upon a complaint in which the major charge was that intervener was a company formed, supported and dominated organization. Although the Board had power to do otherwise, it is no just ground for criticism that it preferred to await the outcome of the proceeding—the determination whether the charge as to the company character of the Association was determined—before it ruled upon the Petition for Investigation. No proper rights of the members of intervener were contravened. It may well have served the public purpose of the Act for the Board to proceed as it did.

When the "unfair" practices, covered by the complaint, were determined, the Board ruled the Petition for Investigation. In view of the conclusion reached by the Board that the Association was an improper bargaining agency, it would naturally follow that it would dismiss the petition of the Association which sought to have itself declared the exclusive bargaining agency. See National Labor Relations Board v. Falk Corporation, 308 U.S. 453, 60 S.Ct. 307, 84 L.Ed. ——.

Conclusion.

The effect upon the order of the Board of what has been hereinbefore stated is as follows: Part "2" (requiring "affirmative action") of the order is modified in the respects following: (1) paragraphs (b), (e) and (g) are disapproved and vacated; (2) paragraphs (d) and (f) are disapproved and vacated in so far as either of them covers Thomas H. Gregg and are otherwise affirmed; (3) paragraph (h) is modified by elimination therefrom the expressions "(b)," "(e)" and "and (g)". Notices containing a copy of the order, as above modified, and the further clear statements that such order of the Board has been approved by this court and will, in all respects, be complied with by petitioner shall be regarded as compliance with part 2 paragraph (h) of the order. Except as set forth above, the order is affirmed.

As so modified, the order of the Board is affirmed, and enforcement thereof is ordered.