UNITED STATES of America,
Plaintiff-Appellee,

v.

Benito SILVA and Carl K. Barker,
a/k/a Bill Barker,
Defendants-Appellants.

Nos. 84–3181, 84–3182.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 21, 1985.

Decided Jan. 9, 1986.

Edward Mogul, Chicago, Ill., for defendants-appellants.

Steven A. Miller, Asst. U.S. Atty., Anton Valukas, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before POSNER, FLAUM, and EASTERBROOK, Circuit Judges.

FLAUM, Circuit Judge.

The defendants Benito Silva and Carl (a/k/a Bill) Barker, were convicted of six counts of mail fraud in violation of 18 U.S.C. § 1341. Silva and Barker appeal that conviction because of an alleged insufficiency of evidence and an alleged abrogation of their right of confrontation. We affirm.

I.

In May 1984, an indictment was returned by a grand jury charging appellants Silva and Barker, as well as Paul Baker, with violations of 18 U.S.C. § 1341. The mail fraud scheme charged in the indictment alleged that the defendants arranged the dismantling of Silva's motor home and made false statements to Silva's insurance carrier in order to obtain the insurance proceeds. Paul Baker pleaded guilty before trial.

The evidence demonstrated that in the fall of 1981, Paul Baker recruited James Galvin to help dismantle a motor home. Galvin agreed and Baker then telephoned someone he identified as "Bill." Baker told "Bill" that he had found someone to assist in dismantling the camper. What Galvin did not tell Baker was that he was an FBI informant.

Galvin, however, told the FBI, and then the jury at trial, that two days after this first meeting he and Baker drove to a farmhouse in Bloomingdale, Illinois where Baker showed Galvin a Pace Arrow Motor Home. Galvin and Baker began the process of stripping the motor home after Baker told Galvin that the job had to be

completed within two weeks because the owner planned to report it stolen. Baker told Galvin that the owner was tired of paying for the vehicle, and that he had a $25,000 insurance policy on it.

For ten days Baker and Galvin dismantled the motor home. Every evening Galvin took pieces of the vehicle to his home where they were photographed by the FBI. Among the items removed and turned over to the FBI was the Vehicle Identification Number ("VIN") tag. The VIN tag showed that the motor home was registered to Benito Silva. Surveillance on November 4th and 5th by the FBI showed that the motor home was in a barn at the farm in Bloomingdale. Surveillance on November 8, 1981 showed that three men were inside the barn with cutting tools dismantling the motor home.

On November 5, 1981 Baker made a telephone call to someone he called "Bill" after Galvin told him that the vehicle was almost completely dismantled. Baker told "Bill" to tell the owner of the motor home that "they were almost done so he can go ahead and report it stolen." Benito Silva reported to the police that the vehicle had been stolen on November 9, 1981. In a statement to the insurer of the vehicle, Silva said that he had parked the vehicle at Carl Barker's house on November 9, 1981 and that it was gone the next day. Silva later stated that he and Barker drove around Chicago in the motor home on November 8, 1981 and that in the afternoon of November 9, 1981 they parked the vehicle in front of Barker's house because Barker was going to use it the next day. Barker substantiated Silva's statement and said that when he went outside the next morning he discovered the theft and notified Silva. Silva mailed a $23,000 claim for the loss of the vehicle to his insurance company on November 10, 1981. Silva and his insurance company corresponded through the mails for the next four months.

Sherry Baker, who was Paul Baker's sister-in-law, helped Baker and Galvin dismantle the motor home. She also later became an FBI informant and testified that on November 10, 1981 she drove with Paul Baker to a body shop where he told her "he was going to see a man named Bill, the guy he got the camper from." Inside the body shop, Sherry was introduced to "Bill" who she later identified as Carl Barker.

After being convicted of six counts of mail fraud, Benito Silva received a sentence of one year and a day for Counts 1–3, three years probation for Counts 4–6, and a $3,000 fine. Carl ("Bill") Barker received two years for Counts 1–3, three years probation for Counts 4–6, and a $3,000 fine.

## II.

### *Sufficiency of the Evidence*

■ Viewing all of the evidence in the light most favorable to the government we hold that there is substantial evidence to support the guilty findings and thus affirm the convictions. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Redwine,* 715 F.2d 315, 319 (7th Cir.1983). The appellant who argues an evidentiary sufficiency challenge bears a "heavy burden" to show that the record contains no evidence from which a jury could find guilt beyond a reasonable doubt. *Id.* at 319. The appellants here have simply not carried that burden.

To prove a violation of the mail fraud statute, 18 U.S.C. § 1341, the evidence must show a scheme, intent to defraud, and the use of the mails. *United States v. Cowart,* 595 F.2d 1023, 1031 n. 10 (5th Cir.1979). In *United States v. Wormick,* 709 F.2d 454, 461 (7th Cir.1983), this court found that the conspiracy doctrines applicable to multimember fraud schemes provided guidance as to how the first prong of the mail fraud statute should be interpreted. These doctrines are particularly important here because whether or not Barker and Silva were part of, or initiated, a "scheme" to defraud by use of the mails is the most difficult prong for the prosecution to meet because Galvin never met or spoke to Barker or Silva. Thus, other than Sherry Baker's identification of Carl Barker as

"Bill," the evidence against them was only a matter of chronology and circumstance.

But the circumstantial evidence is enough in this case. Although mere association with conspirators is, standing alone, insufficient to prove participation in the conspiracy, a single act is enough evidence if the circumstances permit the inference that the act was "intended to advance the ends of the conspiracy." *United States v. Xheka,* 704 F.2d 974, 989 (7th Cir.1983). In addition, "participation in a criminal conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a development and a collocation of circumstances." *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). The prosecution need not prove that the conspirators had an express agreement because "by its nature conspiracy is conceived and carried out clandestinely, and direct evidence of the crime is rarely available. Thus, circumstantial evidence from which the jury could reasonably infer the existence of an agreement is permissible." *United States v. Mayo,* 721 F.2d 1084, 1088 (7th Cir.1983). Once a connection to the conspiracy is proven, even if by circumstantial evidence, the defendant becomes criminally responsible for the actions of his co-schemers. *United States v. Shelton,* 669 F.2d 446, 454 (7th Cir.1982); *United States v. Read,* 658 F.2d 1225, 1230 (7th Cir.1981). Accordingly, because Barker and Silva's participation in the scheme was proven by independent circumstantial evidence, the conduct of the other co-conspirators in furtherance of the scheme is attributable to them when the sufficiency of the evidence is weighed.

The evidence shows that a scheme to defraud the insurance company existed and that Silva and Barker were participants. Existence of a scheme was proven by the fact that the motor home registered to Silva was destroyed by Baker and Galvin, that on November 9, 1981, when Silva and Barker stated they spent the day driving the vehicle around Chicago the vehicle was no more than scrap, and that Silva then filed a claim with his insurance company claiming the vehicle was stolen. These acts connect the defendants to the conspiracy, and the false statements demonstrate an intent to further that conspiracy. *United States v. Xheka,* 704 F.2d at 989.

Proof of Barker's involvement was shown by James Galvin's and Sherry Baker's testimony that as soon as Galvin had been successfully recruited by Paul Baker to help destroy the vehicle, Baker called someone named "Bill" to report that fact. On November 5th and 6th of 1981, after Galvin reported to Baker that the destruction of the motor home was almost complete, Baker again called "Bill" and told him the owner could report the vehicle stolen. Sherry Baker identified Carl Barker as the man named "Bill" from whom Paul Baker said he got the motor home. Finally, Barker's involvement in the scheme was proven by his statement to the insurance company that he had driven the vehicle with Silva on November 8, 1981 and that it was parked in front of his house early the next morning. In fact, multiple witnesses had proven that by November 8, 1981, the Pace Arrow Motor Home had been almost completely dismantled.

Silva's involvement in the scheme was similarly well established. First, Silva's stake in the scheme was proven by the fact that the vehicle was insured by him for $23,000 and had only a $6,000 balance due to the finance company. Thus, a successful insurance claim would net Silva $17,000. On November 9, 1981, Silva falsely reported to the police that the vehicle had been stolen from where he and Barker had parked it. On three separate occasions, Silva represented to the insurance company that he, along with Barker, had driven the vehicle on November 8, 1981, when in fact he had not. These acts are enough to show that Silva intended to further the conspiracy and therefore make him responsible for the actions of his co-conspirators.

This circumstantial evidence demonstrates Barker's and Silva's involvement in a scheme to defraud. Furthermore, "the jury is permitted to infer from one fact the existence of another essential to guilt, if

reason and experience support the inference." *United States v. Key,* 725 F.2d 1123, 1128 (7th Cir.1984). The evidence here, especially the false statements to the insurance company and the police, supports an inference of an intent to defraud, particularly because evidence of whether the defendant has a stake in the outcome of the conspiracy can be used to show an intentional participation in a conspiracy. *United States v. Xheka,* 704 F.2d 974, 988 (7th Cir.1983). In addition, use of the mails is not in dispute in this case. Thus, we hold the requirements of 18 U.S.C. § 1341 have been met.

### III.

#### Right of Confrontation

■ Appellants contend that the district court erred in limiting the cross-examination of three government witnesses by defense counsel, thereby allegedly violating their right to confrontation under the Sixth Amendment to the United States Constitution. They argue that these rulings effectively precluded the defense counsel from probing into either the motive or bias of the government's witnesses, and frustrated any attempt to properly place before the jury evidence which would question the credibility of those witnesses.

This court recently held in *United States v. Murphy,* 768 F.2d 1518, 1536 (7th Cir. 1985), that "management of cross-examination is peculiarly committed to the district court's discretion." In *Murphy* we held that the decision to not allow cross-examination of a witness concerning investigations other than those related to the case on trial falls within the discretion of the district court. *Id.* at 1536. In this case, the instances in which the district court did sustain the government's objections to defense questioning about James Galvin's FBI involvement were related to investigations having nothing to do with the case on trial, but with the approximately ten other investigations in which Galvin served as an informant.

It is important to note the extent to which Galvin was cross-examined. Galvin was cross-examined regarding his financial relationship with the FBI, his prior involvement with drugs and counterfeit money, his prior criminal activities with Paul Baker, his failure to wear a recording device during his meeting with Baker and Carl Barker, his review prior to trial of his grand jury testimony, his testimony against Baker in a state prosecution for attempted murder, and the extent of his false statements to Baker during his dealing with him. It is clear that Galvin was cross-examined on more than just the *presence* of motive or bias: the questioning went to the extent and nature of any "external stimuli" which may have related to his proclivity to speak the truth. *See United States v. Campbell,* 426 F.2d 547, 549–50, 554 (2d Cir.1970).

FBI Agent Caster's, and Sherry Baker's, cross-examinations went in depth into matters concerning their credibility, bias, and recollection. We find that all of the objections sustained by the district court concerned irrelevant or hearsay matters.

Thus, it is clear that the Sixth Amendment rights of the appellants were not violated. The jury was not prevented from examining and weighing the witnesses' motives and credibility because the right to meaningful cross-examination was not abridged. *Greene v. McElroy,* 360 U.S. 474, 496, 79 S.Ct. 1400, 1413, 3 L.Ed.2d 1377 (1959); *Davis v. Alaska,* 415 U.S. 308, 316–17, 94 S.Ct. 1105, 1110–11, 39 L.Ed.2d 347 (1974).

### IV.

For the reasons stated above, we affirm the judgment of the district court.