**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**James D. REYNOLDS,
Defendant-Appellant.**

No. 85–1621.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 21, 1986.

Decided Sept. 18, 1986.

John M. Cutrone, Chicago, Ill., for defendant-appellant.

L. Lee Smith, Asst. U.S. Atty., Peoria, Ill., for plaintiff-appellee.

Before CUMMINGS, Chief Judge, BAUER and CUDAHY, Circuit Judges.

CUMMINGS, Chief Judge.

James Reynolds challenges his convictions of conspiracy to import and distribute marijuana and of interstate travel in support of racketeering. He raises issues of sufficiency of the evidence, prosecutorial misconduct, and sentencing proceeding irregularities. For the reasons discussed below, we affirm the convictions but vacate the sentence imposed and remand for new sentencing in compliance with Federal Rule 32(c)(3)(D) of the Federal Rules of Criminal Procedure.

Statement of the Case and Facts

James Reynolds, defendant, was convicted by a jury of conspiracy to import and distribute more than 1,000 pounds of marijuana in violation of 21 U.S.C. §§ 846 and 955c. He was also convicted of interstate travel in aid of racketeering, a violation of 18 U.S.C. § 1952(a)(3). Defendant was sentenced to one 8–year term and two 5–year terms on the three counts, the sentences to be served concurrently.

In May 1984, Donald Harms was contacted by his uncle, John Ferrarini, about renting and piloting an airplane. Harms became suspicious of his uncle's plans for the plane and contacted the Federal Bureau of Investigation (FBI). Harms agreed to help investigate his uncle by recording conversations. Some fourteen phone calls between Harms and Ferrarini were recorded during the first week of June. These conversations centered on the type of aircraft needed and the job Harms was to do. Ferrarini cautioned his nephew about speaking too openly over the telephone. In a telephone conversation on June 7, 1984, the defendant, James Reynolds, spoke with Harms; the conversation involved the type of airplane and its capacity to carry cargo. A meeting was planned for the next day at a restaurant in Princeton, Illinois.

Present at the June 8th meeting were Harms, Ferrarini, Reynolds, and Frank Gato, Reynolds' business partner. Harms wore a recorder during the meeting. Transcripts of the conversation were introduced at trial. During this meeting the group discussed the range of the chosen aircraft, a Piper Navajo, and how much weight it could carry. Harms attempted to get the others to disclose the specifics of the plan. Harms was informed that he would be transporting marijuana. Reynolds told Harms that the plan was for the two of them to fly the marijuana from Colombia to Bimini in the Bahamas. Up to this point Harms had had no idea what their cargo would be; he had thought it was to be cocaine. The conversation turned to the aircraft and the potential profitability of the trip. Reynolds expressed concern over the ability to carry a large quantity of cargo over the necessary distance. Harms was told that the longest leg of the flight would be 1,200 miles.

At one point in the conversation, Reynolds and Ferrarini left the table. While they were absent, Harms continued to question Gato about the ultimate destination for the marijuana. Gato responded that the plan was to bring it into the United States by boat from Bimini on the same day. Eventually Harms left to meet with the FBI. Reynolds, Gato, and Ferrarini were arrested as they left the restaurant.

The defendant raises three issues on appeal. First, whether there was sufficient evidence to show that (a) he knew the marijuana was to be imported into the United States and (b) the group was planning to carry more than 1,000 pounds of marijuana. The second issue is whether statements concerning the judge's responsibility to decide issues of probable cause constituted prosecutorial misconduct. The third issue is whether the judge should have ruled on defendant's proposed corrections

in the presentence report before sentencing. We affirm the convictions but remand for proper sentencing.

## I. SUFFICIENCY OF THE EVIDENCE

### A. Importation into the United States.

■ The defendant concedes that he was part of a scheme to transport marijuana out of Colombia. But he contends that the evidence fails to establish that he agreed to bring the marijuana into the United States. The government maintains that sufficient evidence was presented to the jury for them to infer his knowledge of the ultimate destination. We agree that the jury had enough evidence to conclude that Reynolds was part of the scheme to import marijuana into the United States so that the convictions on all three counts were sustainable from an evidentiary viewpoint.

This Court employs the traditional reasonableness test when reviewing claims of insufficiency of the evidence. This Court must review the evidence in a light most favorable to the government to determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in the original); *United States v. Wiehoff,* 748 F.2d 1158, 1160–1161 (7th Cir.1984).

Conspiracy to distribute marijuana in violation of 21 U.S.C. §§ 846 and 955c requires an agreement to distribute the contraband within the United States. *United States v. Hayes,* 653 F.2d 8 (1st Cir.1981). The existence of an agreement may be proven by circumstantial evidence based upon the conduct of the parties or substantial evidence of the entire scenario. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942) ("a common purpose and plan may be inferred from a development and collocation of circumstances"). Even without personal communication, tacit understanding of the usual business arrangements through a long course of conduct between the parties is enough to constitute an agreement.

*United States v. Consolidated Packaging Corp.,* 575 F.2d 117, 126 (7th Cir.1978).

Reynolds claims that the tape-recorded conversations actually support his position that he was not aware that the marijuana would be shipped into the United States. Reynolds points to his discussion with Harms when he said:

Reynolds: Here's what it is. Uh ... we got a load of smoke ...

Harms: Oh.

Reynolds: In Colombia, and a, and you're ...

Harms: Jesus Christ, you're not gonna bring back much grass.

Reynolds: No, listen to this, we're not bringing it back in the country.

Gato: Not to the country.

Reynolds: You're not gonna bring anything to this country and risk that.

Harms: Oh.

Reynolds: That's not what it is. You and I ...

Harms: Yeah.

Reynolds: I'm gonna be with you, you are going to Colombia.

Harms: Uh-huh.

Reynolds: We're going to go from Colombia, back to Bimini.

Gato: It's an island.

Harms: Yeah, I know where Bimini is.

Reynolds: Unload it, clean the plane, the plane will be cleaned there, and then we'll come home.

After Harms restates the proposed plan as flying to Colombia, picking up marijuana, and then flying to Bimini, Reynolds responds:

Reynolds: Yeah.

Harms: That's all there is.

Gato: That's all there is.

Reynolds: That's it, that's all.

From this conversation Reynolds insists that the jury could not have concluded that he knew that the marijuana would be brought into the United States. Instead, Reynolds argues, these portions demonstrate that *his* understanding is that the marijuana was only going from Colombia

to Bimini so that none of the three statutes was violated.

But the jury had other evidence to consider. The transcript given to the jury reflects that immediately after Reynolds' last statement above, Gato said to Harms, "Your job is to Bimini, *then we transport it* (emphasis supplied)." The defendant challenges the interpretation of the phrase "then we transport it," but the accuracy of the government's version of the tape-recorded conversations was a question of fact for the jury. Furthermore, Gato later disclosed to Harms the details of the importation plan:

> Harms: How far is Bimini from Miami?
>
> Gato: Bimini is exactly forty-eight miles.
>
> Harms: Forty-eight?
>
> Gato: Yeah.
>
> Harms: Hum.
>
> Gato: Only twenty minutes flight ... from Miami.
>
> Harms: Nothing to it.
>
> Gato: It's real close.
>
> Harms: What they do, boat her in then?
>
> Gato: [unintelligible]
>
> Harms: I don't give a shit, they boat her back in?
>
> Gato: Yeah.
>
> Harms: That's all them bales floatin' around those beaches you hear about.
>
> Gato: We'll bring it in by boat and ...
>
> Harms: Bring her in by boat.
>
> Gato: By boat, same night, same day.
>
> Harms: Same time.

These details resolve any ambiguities in Gato's phrase "then we transport it." Although this discussion took place while Reynolds was away from the table, the jury was aware of the close and long-standing working relationship between Gato and

Reynolds.[1] In fact, for the jury to have concluded that Gato would keep his long-standing partner in the dark about the final destination, yet reveal it so freely to an outsider hired only to fly the goods, would be preposterous.

**B. 1,000 Pounds**

The defendant next contends that the evidence was insufficient to support a conviction for a conspiracy to distribute more than 1,000 pounds of marijuana. Under 21 U.S.C. §§ 846 and 841(b)(5) and (c), conspiracy to distribute an amount less than 1,000 pounds of marijuana carries a maximum sentence of 5 years; for more than 1,000 pounds the penalty is up to 15 years. Again, in this conspiracy case to sustain the eight-year sentence under Count I the government must prove that Reynolds and his cohort had an agreement to distribute in excess of 1,000 pounds. See *United States v. Butz*, 784 F.2d 239, 240 (7th Cir. 1986). Because there was no direct evidence of the amount of marijuana the defendants conspired to transport, the government attempted to prove the amount indirectly. See *United States v. Silva*, 781 F.2d 106 (7th Cir.1986) (direct evidence rarely available in conspiracy cases). Experts were called on both sides to speculate as to the feasibility of the chosen Navajo aircraft to carry 1,000–plus pounds of cargo, two persons, sufficient fuel, oil, etc.

The government's expert testified to the following calculations based on a 1,000–mile range:

```
2250 lbs  useful load.[2]
(1152)    fuel
(  45)    oil
( 410)    pilot and passenger
 643 lbs  cargo availability
 325      5% over gross weight[3]
 968 lbs  total cargo capacity
```

---

**1.** Reynolds summarized their relationship well by saying on tape, "Frank [Gato] and I live and breathe this shit all the time."

**2.** Useful load is the gross weight a particular aircraft is capable of flying minus the weight of the aircraft itself.

**3.** The expert testified that the Navajo could conceivably fly at 5% above gross weight.

The traveling distance with cargo (from Colombia to Bimini) is not in evidence. The only range testimony is that the longest leg of the journey would be from the United States to Colombia (1200) miles and the way back (Colombia to Bimini) was less. The jury could reason that if the journey was feasible with 968 pounds cargo, a shorter journey (Colombia to Bimini) with more cargo was within the realm of possibility. Moreover, the nature of the discussions between Harms and the conspirators showed that they were very much interested in carrying as much marijuana as possible.[4]

The government buttresses its argument with evidence that the conspirators planned at least three marijuana trips. The defense concedes that Reynolds indicated a willingness to engage in future trips, but argues no agreement to do so was ever reached. During the June 8th meeting the defendant stated:

> Reynolds: Your job is to fly a fucking airplane and get you and me down there in one piece, and get us back with the goods. That's it and if you can spare the time ...
>
> Harms: Yeh.
>
> Reynolds: ... Wait a couple of days and we'll do a turnaround and do it again. Then we all lay down for a couple weeks and then we'll do it again. (Govt. Ex. 5, p. 16).

From these statements and the evidence of the continuous business relationship between Gato and Reynolds the jury was entitled to infer that they agreed to make numerous trips. The government does not have to prove that the conspirators had an express agreement: "circumstantial evidence from which the jury could reasonably infer the existence of an agreement is permissible." *United States v. Mayo*, 721 F.2d 1084, 1088 (7th Cir.1983).

---

4. It is not necessary that the conspirators could have been successful in completing their crime. In other words, if the conspirators planned to fly 1,500 miles with 1,500 pounds of marijuana into the United States, but would surely have crashed, they could still be guilty of conspiracy

Because the first trip would bring at least close to 1,000 pounds of marijuana to the United States, by the third trip the conspiracy would have easily passed the 1,000 pound mark. The combination of direct and circumstantial evidence permitted the jury to conclude that the conspiracy was created to import marijuana into the United States and that it would ultimately involve more than 1,000 pounds.

## II. PROSECUTORIAL MISCONDUCT

■ Defendant contends that a portion of the prosecutor's closing argument unfairly prejudiced him by giving the jury the impression that the judge thought the defendant was guilty. The government has responded by asserting that the argument was "invited" by the defendant. The defendant raises two distinct legal issues here: whether the prosecutor's behavior was error, and if so, whether it is reversible error. The "invited response" doctrine is relevant only to the latter issue. *United States v. Pollard*, 790 F.2d 1309 (7th Cir. 1986). The invited response doctrine does not give prosecutors a license to make improper arguments; it only puts such arguments in context. *Darden v. Wainwright*, — U.S. —, —, 106 S.Ct. 2464, 2472, 91 L.Ed.2d 144 (1986); *United States v. Young*, 470 U.S. 1, 105 S.Ct. 1038, 1044–1045. Once placed in context a reviewing court must decide if the defendant was unfairly prejudiced. *Darden*, — U.S. at —, 106 S.Ct. at 2472; *United States v. Wheeler*, 800 F.2d 100, 106–07 (7th Cir. 1986).

■ During closing rebuttal argument the prosecutor said:

> But there are a lot of non issues in this case.... Those deal with issues about whether or not these defendants should have been arrested, whether or not the Bureau County [*sic*] should charge these defendants and whether or not the Unit-

---

to distribute in excess of 1,000 pounds of marijuana. *United States v. Bagnariol*, 665 F.2d 877 (9th Cir.1981), certiorari denied, 456 U.S. 962, 102 S.Ct. 2040, 72 L.Ed.2d 487 (1982); *United States v. Oviedo*, 525 F.2d 881 (5th Cir.1976).

ed States should be allowed to charge these defendants.

I stated in my opening, ladies and gentlemen, that the judge has a job and that you have a job, and the judge's job is to determine the law, and the judge's job is to determine whether or not these people should be arrested and whether or not it is permissible to bring these charges against these defendants. [R. Dec. 11, 1984, p. 227]

The trial judge denied defendant's immediate motion for a mistrial but gave the following cautionary instruction:

Ladies and gentlemen, the recent arguments of [the prosecutor] concerning what are the legal issues in this case is not an accurate statement of the law. The legal issues of this case will be stated to you by me in my instructions of law.

The prosecutor's reference to the judge's role in deciding whether it is permissible to arrest and bring charges against the defendants was of course error but did not tell the jury that the judge had decided that defendants were guilty. While the defense counsel had attacked the accuracy of law enforcement witnesses' reports, affidavits and Grand Jury testimony, primarily for impeachment purposes, the above remarks cannot really be considered an invited response. Nevertheless, they were not really prejudicial, as Judge Mihm recognized (Vol. IV Tr. 229). In any event, their effect, if any, was immediately blunted by the cautionary instruction given by the judge. Therefore the error was not reversible. See *Wheeler*, at 107.

## III. SENTENCING

The defendant contends that the district court failed to abide by Rule 32(c)(3)(D) of the Federal Rules of Criminal Procedure and the mandates of *United States v. Rone*, 743 F.2d 1169 (7th Cir.1984). At the sentencing hearing the judge asked defendant and his counsel if they had read the presentence report and whether they had any objections to it. The defense counsel responded that Reynolds had prepared a list of inaccuracies. Only four were mentioned by the defense counsel, namely, dispute over the government's claims that: (1) the shipment was going to Reynolds' marina business; (2) there was in excess of 1,000 pounds of marijuana; (3) Reynolds' marina business had failed prior to his arrest; and (4) he used a communication device in furtherance of the conspiracy. Defense counsel downplayed the remainder of Reynolds' listed items and they were not specifically referred to. The defendant also was asked by the judge if he had any problems with the presentence report. He responded, "I'm in agreement with my attorney as to the itemized list that I made out while in Tazewell County Jail."

The sentencing judge explicitly agreed with defense counsel that a count containing a communication device charge had been dropped and thus was improperly included in the presentence report. As to the other alleged inaccuracies the court simply made a general statement that the government was entitled to present its version of the facts. This statement was made after recitation of the first of the above claimed errors in the report but before the other three. The judge told defense counsel to prepare a memorandum of the defendant's complaints and attach it to the presentence report. He then proceeded to sentence the defendant. Under *United States v. Rone*, 743 F.2d 1169 (7th Cir.1984) and *United States v. Eschweiler*, 782 F.2d 1385 (7th Cir.1986), this procedure did not fulfill the requirements of Rule 32(c)(3)(D).

Federal Rule of Criminal Procedure 32(c)(3)(D) provides that when a defendant alleges inaccuracies in the presentence report, the sentencing court must make written findings as to the allegations or a written determination that the disputed matters will not be relied on for sentencing. The rule also requires that the findings or determination be attached to the presentence report. *Eschweiler*, 782 F.2d at 1387. The purpose of the Rule is both to protect the defendant's due process right to a fair sentencing procedure and to provide a clear record of the disposition of controverted

facts in the presentence report. *Id.;* Fed. R.Crim.P. 32 Advisory Committee Notes. On this record it is far from clear whether the sentencing judge made findings with respect to the enumerated alleged inaccuracies, not to mention the rest of the list, the content of which was never orally brought to the court's attention. Nor did the court state that it would not rely on the disputed facts for sentencing.

Unlike *Eschweiler,* the court did not clearly impose the sentence on grounds other than those questioned by the defendant. See 782 F.2d at 1390. Although the court did give a general statement of its reasons for imposing the particular sentence on the defendant, it is unclear whether and to what degree the contested information may have played a part in the decision. Moreover, the court was aware of claimed inaccuracies that were never orally delineated. Since it is unclear whether the judge relied on information contested by the defendant, it is necessary to remand for resentencing in compliance with Rule 32(c)(3)(D). See *id.* at 1390 & n. 11.

Additionally, allowing the defendant to attach a memorandum outlining his grievances does not meet the Rule's requirements that the court attach a written determination of its findings or determination to the presentence report. First, the court has not made any findings under this approach. The Rule imposes an obligation on the court, not the defendant, to deal with and respond to presentence report complaints before sentencing a defendant. Second, the purpose of providing prison and parole authorities with a clear record of how disputes were resolved is not met by simply having the defendant list his grievances and attaching them to the presentence report.[5]

The government also argues that we may not rely on the defendant's factual inaccuracies to vacate his sentence because they are not in the record. The government misconstrues the defendant's argument and our response. The remand for resentencing is not because the facts therein were inaccurate. The remand is necessary because the sentencing court is required under Rule 32(c)(3)(D) to make a finding one way or the other. Because the record is unclear, a remand is essential. See *Eschweiler,* 782 F.2d at 1390 & n. 11.

For the reasons discussed above the defendant's convictions are affirmed but we remand the cause for resentencing in compliance with Rule 32(c)(3)(D).

---

**5.** The Government also argues that the defendant merely complains of its version of the facts. Because it is entitled to include those in the presentence report, the Government submits there was no error. Unfortunately, neither we nor the sentencing court are aware of all the defendant's complaints about the contents of the presentence report since some of them were not specifically addressed. And it is not clear whether the disputed facts were merely disagreements with the government's version of the evidence adduced at trial, *e.g.,* whether the defendant's business failed before or after his arrest.

The Government also argues that it was the defense counsel who failed to inform adequately the sentencing judge of the alleged inaccuracies and who downplayed their significance. However, at the sentencing hearing the defendant reasserted his complaints, referring to the list he made while in jail. Furthermore, under Rule 32(c)(3)(D) it is the judge who has the duty to resolve any claimed inaccuracy brought to his or her attention.