UNITED STATES of America,
Plaintiff-Appellee,

v.

Fred W. GARVER, Larry R. Mohr,
Defendants-Appellants.

No. 85–2370, 85–2371.

United States Court of Appeals,
Seventh Circuit.

Argued June 11, 1986.

Decided Jan. 15, 1987.

As Amended Jan. 16, 1987.

James H. Voyles, Ober, Symms, Cardwell, Voyles, & Zahn, Don A. Tabbert, Tabbert & Capehart, Indianapolis, Ind., for plaintiff-appellee.

Bradley L. Williams, Acting U.S. Atty., U.S. Atty's Office, Indianapolis, Ind., for defendants-appellants.

Before WOOD, COFFEY, Circuit Judges, and SWYGERT, Senior Circuit Judge.

COFFEY, Circuit Judge.

Appellants Fred W. Garver and Larry R. Mohr appeal their convictions for conspiracy to commit mail fraud, 18 U.S.C. § 371, mail fraud, 18 U.S.C. § 1341, and for violating the RICO statute, 18 U.S.C. § 1962. Garver also appeals his concurrent three-year sentences for mail fraud and conspiracy to commit mail fraud as well as his sentence to a concurrent six year term of imprisonment pursuant to 18 U.S.C. § 1963(a) for violation of the RICO statute. We affirm.

## I

This case arose out of the efforts of the defendants to persuade local tax officials to reduce the property tax assessments on two parcels of land in downtown Indianapolis, Indiana, known as the Merchants Plaza and the Maryland Street Garage. The owner of the Merchants Plaza, the PRT Joint Venture, became concerned about its property assessment when Center Township Assessor James Cunningham[1] issued a Notice of Assessment for the year 1977 in the amount of $10,723,730.00, prepared by the Chief Deputy Assessor Charles Rawlings. Since the assessment was considerably higher than PRT had anticipated, they appealed the assessment to the Marion County Board of Review.

William Moore, a member of the executive committee responsible for the operation of the PRT Joint Venture (PRT), hired attorney Kent Howard, a partner in the

---

1. Center Township is located in Marion County, Indiana and encompasses downtown Indianapolis.

Indianapolis law firm of Barnes, Hickam, Pantzer & Boyd, and the defendant Garver to represent the Merchants Plaza in the appeal of its 1977 assessment and in any future assessment proceedings involving PRT properties. PRT hired Howard and Garver on a contingency fee basis after agreeing that their legal fee would be determined by the amount that they were able to persuade the local tax officials to reduce the Merchant Plaza property value assessment. PRT also hired defendant Mohr and Claude Magnuson to assist Garver and Howard.

In July 1978, Deputy Assessor Rawlings prepared and issued another Notice of Assessment for Merchants Plaza, this time for the 1978 tax year, setting the value of the complex at $10,985,300. Garver, on behalf of PRT, appealed this assessment to the Marion County Board of Review. The hearings on the 1977 and 1978 Merchants Plaza assessments were consolidated and scheduled to be heard on September 7, 1978 by the Marion County Board of Review.

Prior to the September hearing, Claude Magnuson contacted his friend Frank Corsaro, the Marion County Assessor and President of the Marion County Board of Review. Because Magnuson wanted Corsaro to aid in reducing the Merchants Plaza assessments, Magnuson offered Corsaro $5,000 for the campaign of Henry Bayt, a relative of Corsaro who was running for the position of Center Township Assessor. Corsaro told Magnuson that Bayt did not need the money but that Corsaro could use the money since he was about to open a used car dealership. Approximately one week before the September hearing, Corsaro and Magnuson met again, and Magnuson gave Corsaro an envelope containing $3,000. As Magnuson handed the envelope to Corsaro, he told Corsaro that he would "get the other to you as soon as I can, as soon as we get it."

In May, 1978, Deputy Assessor Rawlings contacted Mohr to determine whether Mohr would be interested in purchasing a tax consulting firm from the widow of one of Rawling's friends. About two weeks later,

Rawlings, Garver, and Mohr met for lunch and decided that they would form their own tax consulting firm. Thereafter Garver, Mohr, and Rawlings met on a number of occasions to discuss the establishment of their firm and in August of 1978, at one of their meetings, Garver told Rawlings that he and Mohr were representing Merchants Plaza in its property tax appeal before the Marion County Board of Review. Garver and Mohr did not want Rawlings' employer, James Cunningham, and the Center Township Assessor to voice any objections if the Marion County Board of Review lowered Cunningham's 1977 assessment of Merchants Plaza. They were interested in having Rawlings convince Cunningham neither to object to nor appeal any decision of the Marion County Board of Review lowering Cunningham's assessment of Merchants Plaza.

On September 7, 1978, the day of the Marion County Board of Review hearing, Garver gave Deputy Assessor Rawlings a cashier's check drawn on the Carmel Bank and Trust Company for $5,000. Mohr was at that time chairman of the board of the Carmel Bank and Trust. Garver had Rawlings sign a note to the Carmel Bank and Trust, and when Rawlings asked "why the note?" Garver responded that "we're going to handle it this way." Rawlings called Mohr after talking with Garver and inquired as to why he had to sign a note. Mohr advised Rawlings to sign the note at the bank and not worry about it. Rawlings cashed the check that day and gave Cunningham $2,500, informing him that Garver and Mohr were his partners and suggesting to Cunningham that he not appeal the Marion County Board of Review's decision on the Merchants Plaza assessment to the State Board of Tax Commissioners as he was entitled to do under Indiana Law.

The Marion County Board of Review issued its decision to reduce the assessments on Merchants Plaza on September 18, 1978. The decision of the board fails to delineate the vote of each board member, but the record is clear that Cunningham did not appeal the decision. Subsequently, Claude

Magnuson paid Marion County Assessor Corsaro the remaining $2,000 of his $5,000 payment. The reduction in the Merchants Plaza assessment generated a legal fee in the sum of $232,000 with Howard, Garver, Mohr, and Magnuson dividing the fee.

In October, 1978, Rawlings prepared the first property value assessment on a new parking garage owned by the Maryland Street Garage Corporation. The Notice of Assessment was issued October 16, 1978 and set the assessed value of the garage at $762,850.00. When Mohr learned that Rawlings made an assessment of the garage, he stated to Rawlings "I may be able to get these people as a client." Mohr instructed Rawlings not to change anything until he was assured that "we" had a client. Mohr explained that there was money in this for both of them.

When C. Perry Griffith, the president of the Maryland Street Garage Corporation, received the Notice of Assessment, he contacted attorney Lester Irons seeking advice on how to obtain a reduction in the assessed valuation of the Maryland Street Garage Corporation's garage. Irons consulted Howard, who worked for the same law firm as Irons (Barns, Hickam, Pantzer & Boyd). Irons and Howard conferred with Griffith, and Griffith at this time agreed to turn the matter over to Midwest Appraisers, Inc., the new tax consulting firm that Garver, Mohr and Rawlings were in the process of forming. Howard referred the matter to Garver and Mohr, and Mohr subsequently called Rawlings advising him that Mohr would be representing the Maryland Street Garage Corporation. Mohr suggested to Rawlings that he reduce the assessment. On November 10, 1978, Rawlings prepared and sent a new Notice of Assessment lowering the assessed value of the garage. This second assessment notice was improper since under the Indiana Assessment Act, once an assessment has been issued by a township assessor in Indiana it is subject to change only through appeal. In order to disguise this impropriety, Rawlings testified that he altered the Center Township Assessor's permanent records, erasing the figures on the assessor's permanent record card and inscribing new ones.

On November 20, 1978, Rawlings signed the Articles of Incorporation for Midwest Appraisers, Inc., a tax consulting firm consisting of Rawlings, Mohr, and Garver. After the Maryland Street Garage assessment was reduced, Lester Irons wrote a letter to Griffith forwarding a bill from Garver for services rendered in obtaining a reduction in the Maryland Street Garage's assessment. Irons stated in the letter that Griffith's Company should issue a check to Garver in the amount of $9,202 and that Irons would see that the check was delivered to Mohr. Irons stated that it was his understanding that only Garver and Mohr had worked on this project. Garver, Mohr, and Rawlings split the $9,202 payment.

On January 1, 1979, Henry Bayt became the Center Township Assessor and hired Frank Corsaro as his Chief Reassessment Deputy. Bayt directed Corsaro to prepare and send a notice of a proposed change of assessment for Merchants Plaza increasing the assessed value of the property from $8,040,470.00 to $28,453,930.00. In letters dated October 18, 1979 and October 29, 1979, PRT executive committee member Moore, and PRT's attorney, Kent Howard, confirmed that "Midwest Appraisers" would receive a contingency fee for their services in securing a reduction in the assessed value of Merchants Plaza. Later, Bayt issued an official Notice of Assessment for Merchants Plaza establishing an assessed value of $28,453,930 for the property. On November 8, 1979, Garver, Magnuson, Bayt, Corsaro, and Moore met at Bayt's office to discuss the latest Merchants Plaza assessment. The next day, Magnuson returned to Bayt's office to reassert PRT's position that the new Merchants Plaza assessment should be reduced and stated to Bayt: "I hope you can make it right for me and I will make it right for you."

On November 12, 1979, Bayt issued a second Notice of Assessment for Merchants Plaza lowering the assessed value

of the property to \$10,791,380, the figure requested by PRT on November 8, 1979, and took the new notice to Magnuson's office. When Magnuson saw the notice, he picked up a \$15,000 check that Garver had made out to Magnuson, dated November 9, and told Bayt that "this is my fee; I will give you half of it, or I will give you ten thousand, whatever you want." Bayt replied "do whatever you want, Claude." Magnuson subsequently made a series of payments to Bayt totalling \$7,300.00. The reduction in the assessment of Merchants Plaza produced a fee of \$921,050.00 for Midwest Appraisers with Garver, Mohr, Howard and Rawlings dividing the fee.

## II

■ Initially, Garver and Mohr assert that the trial court erred in admitting statements made by their co-conspirators pursuant to Federal Rule of Evidence Rule 801(d)(2)(E) arguing that the government failed to prove at the pre-trial Santiago hearing that they were members of a criminal conspiracy. Neither defendant identifies the particular statements he claims were improperly admitted in evidence at trial. In *United States v. Santiago*, 582 F.2d 1128 (7th Cir.1978), this court stated that Rule 104 of the Federal Rules of Evidence "requires a preliminary determination by the trial judge as to the admissibility of the declaration of a co-conspirator." *Id.* at 1131. The court went on to state that "[u]nder Rule 104 the competence of a co-conspirator's declaration justifying its admissibility depends upon whether or not the existence of the conspiracy has been sufficiently established, and whether under Rule 801(d)(2)(E) the declaration was made during the course and in furtherance of the conspiracy." *Id.* In *United States v. Xheka*, 704 F.2d 974, 985 (7th Cir.1983), we stated that "[a] statement is admissible under this rule [Fed.R.Evid. 801(d)(2)(E) ] only when the government has established by a preponderance of the evidence, independent of the statement itself, that (1) a conspiracy existed, (2) that the defendant and the declarant were members of the conspiracy,

and (3) that the statement was made in the course of the conspiracy." Since Garver and Mohr do not contend that the government failed to demonstrate at the *Santiago* hearing that a conspiracy existed and that the statements made by their co-conspirators were not in furtherance of the conspiracy, we need only consider whether the government established at the *Santiago* hearing that Garver and Mohr were members of a criminal conspiracy. "The law is clear that '[o]nce the Government proves the existence of a conspiracy, the Government need only offer "slight evidence" to prove that an individual was a member of the conspiracy.'" *United States v. Williams*, 798 F.2d 1024, 1046 (7th Cir. 1986) (Coffey, J., dissenting) *quoting United States v. Gironda*, 758 F.2d 1201, 1217 (7th Cir.1985).

At the *Santiago* hearing, the government presented evidence that Garver and Mohr conspired with Rawlings to illegally reduce the Maryland Street Garage Corporation property assessment. The prosecution introduced a letter written by Lester Irons to C. Perry Griffith, the president of the Maryland Street Garage that stated:

I am enclosing a statement from Fred W. Garver in the amount of \$9,202 for legal services rendered Maryland Street Garage Corporation in getting the adjustment in the tax assessment. I am sure you will want to check to see that this is the correct computation.

If you will, at your convenience, make out the check to Fred W. Garver and let us have it, I will see that it is delivered to Larry Mohr, and that we get a receipt from him. As I understand it, Garver and Mohr were the only ones working on this particular project.

The letter directs Griffith to write a check made out to Garver as payee and states that Irons would deliver it to Mohr. Through the testimony of Lisa Platt, an assistant vice-president and cashier of the Carmel Bank and Trust, the prosecution traced this payment to payments made by Garver and Mohr to Rawlings. Rawlings testified at the *Santiago* hearing that he

plead guilty to committing mail fraud on the basis of his participation in the conspiracy to illegally reduce the Maryland Street Garage assessment.

The government also introduced evidence that Garver and Mohr were employed to represent Merchants Plaza and received fees from PRT, the owners of Merchants Plaza. The evidence demonstrated that Garver made payments to Magnuson. Frank Corsaro testified that Magnuson offered to "donate $5,000 to Henry Bayt's campaign for Center Township Assessor if I would make the [Merchants Plaza property tax assessment] petition right." Cosaro stated that he told Magnuson that "I would be willing to do it, but at that time I needed the $5,000 a lot more than Henry Bayt's campaign did." Corsaro also testified to a series of other related bribe payments.

The government established at the *Santiago* hearing that a conspiracy existed to illegally reduce property tax assessments in Indianapolis, Indiana through the testimony of Rawlings and Corsaro. Garver and Mohr do not argue that the government failed to establish at the *Santiago* hearing that a criminal conspiracy existed; they only contend that the government did not demonstrate that they (Garver and Mohr) were members of a conspiracy.

As already noted, once a criminal conspiracy has been established, the government need only present "slight evidence" in order to prove a particular individual's participation in the conspiracy. *United States v. Gironda*, 758 F.2d 1201 (7th Cir.1985); *United States v. Dalzotto*, 603 F.2d 642 (7th Cir.1979). *See also United States v. Williams*, 798 F.2d 1024, 1046 (7th Cir. 1986) (Coffey, J., dissenting). A review of the record thus reveals that the government produced more than slight evidence that Garver and Mohr participated in a criminal conspiracy. The government established that Garver and Mohr worked together to funnel money to Rawlings with the intention of bribing him to illegally reduce the Maryland Street Garage assessment. Moreover, the evidence introduced at the *Santiago* hearing proved that Gar-

ver and Mohr represented Merchants Plaza, and that Garver made payments to Magnuson who in turn bribed Marion County Assessor Corsaro to illegally reduce the Merchants Plaza property assessment. We hold that the evidence submitted at the *Santiago* hearing demonstrated that Garver and Mohr were involved in an illegal conspiracy to bribe tax authorities to lower the tax assessments on the Merchants Plaza and the Maryland Street Garage, and therefore established a proper basis for the admission of their co-conspirators' statements in evidence at trial.

### III

■ Mohr next contends that the trial court erred in permitting the government to introduce government exhibits 32, 32a, copies of a letter written by attorney Lester Irons to C. Perry Griffith, the president of the Maryland Street Garage Corporation, asking Griffith to have a check issued to Garver, and 32b, a letter from Griffith to Garver forwarding the check to Garver. In his letter to Griffith, Exhibit 32, Irons writes that "I will see that it [the check] is delivered to Larry Mohr and that we get a receipt from him." Irons continues in the letter to state that "[a]s I understand it, Garver and Mohr were the only ones working on this particular project." Mohr argues that this letter should not have been admitted in evidence since the government had in its possession two FBI 302 statements containing an interview with Edward Delaney wherein Delaney states that Irons told him that Irons did not know whether or not Mohr was involved in representing the Maryland Street Garage. In his reply brief Mohr states that "it is true that the Defendant Mohr did not specifically allege prosecutorial misconduct." Mohr's argument seems somewhat unclear in that he appears to argue that the exhibits are inadmissible because FBI reports containing an interview with Delaney contradict Iron's letter. This argument goes to the weight of the evidence and not to its admissibility. The government points out that Mohr had the opportunity to call Delaney as a wit-

ness and for some reason chose not to do so.

Mohr presents no other argument for the exclusion of government exhibits 32, 32a, and 32b. The government, however, argues that it met all of the evidentiary requirements for the admission of exhibits 32, 32a, and 32b in evidence at trial. The prosecution maintains that it demonstrated the authenticity of exhibits 32 and 32a (copies of the letter from Irons to Griffith) through the testimony of Georgia Lord, Irons' former secretary. The government also asserts that it proved that exhibits 32a and 32b (the letter from Irons to Garver) were admissible under the business records exception to the hearsay rule. Because the government met all of the evidentiary requirements for the admission of exhibits 32, 32a, and 32b, we hold that they were properly admitted by the trial court.

### IV

■ Garver and Mohr next argue that the district court erred in allowing the government to introduce evidence relating to the payment of fees and the subsequent distribution of the money derived from the payment of fees. The defendants claim that the introduction of evidence pertaining to the fees was both cumulative in nature and irrelevant. Garver and Mohr, charged with mail fraud, both contend that the evidence was irrelevant because proof of profit by the defendant is not an element of the crime of mail fraud.

Counsel for the government maintained at oral argument that evidence was properly admitted pointing out that, while the defendants might assert that the fees they received were legitimate, the evidence demonstrated that the PRT fees were distributed in such a way as to suggest their illegal character. For example, pursuant to partnership agreements with their respective law firms, Garver and Howard were prohibited from receiving separate fees for services and not sharing all of the fees they earned with their partners. Evidence introduced at trial demonstrated that Howard made out the check to Garver individu-

ally and not to Garver's law firm, and that Garver, in contravention of his law partnership agreement, accepted the check and deposited it in his personal bank account. Garver subsequently wrote checks to Mohr, Magnuson, and Howard. Howard thus received a "kickback" in violation of his law firm's partnership agreement. The government argues that "the pattern of the fee payments and disbursements were relevant for their (1) timing, (2) handling, (3) form of disbursement, (4) recipients, and (5) concealment."

"The district court has broad discretion to determine the admissibility of evidence, and thus we will reverse the court's evidentiary rulings only upon a clear showing of abuse of discretion." *United States v. Hattaway*, 740 F.2d 1419, 1424 (7th Cir. 1984). "The trial court has broad discretion in determining whether proferred evidence should be admitted and in general in the 'absence of a significant showing of unfair prejudice, evidence with substantial probative value should not be excluded.'" *Martell v. Boardwalk Enterprises*, 748 F.2d 740, 747 (2nd Cir.1984) *quoting United States v. Jamil*, 707 F.2d 638, 644 (2nd Cir.1983). We hold that the trial court did not abuse its discretion and properly permitted the government to introduce evidence relating to the payment of fees and distribution of fees at trial because the evidence was relevant in demonstrating how Garver and Mohr conspired to commit mail fraud and Garver and Mohr have not demonstrated that such evidence unfairly prejudiced their trial.

### V

■ Garver and Mohr argue that the trial court erred in denying their respective motions for severance maintaining that they should not have been tried with Claude Magnuson. Counts 1–4 and 7 of the indictment charged that Garver, Mohr and Magnuson committed mail fraud, conspired to commit mail fraud and violated the RICO statute. Count 5 of the indictment charged Magnuson with witness tampering in violation of 18 U.S.C. § 1512,

while Count 6 of the indictment charged only Garver and Mohr with mail fraud. Magnuson was acquitted on Count 5 of the indictment.

In *United States v. Dounias,* 777 F.2d 346 (7th Cir.1985), we stated that "[t]he decision to grant or deny severance is left to the judgment of the trial court and we will not reverse this decision absent a clear abuse of discretion." *Id.* at 350. We went on to state that "[i]n order to meet this burden the defendant must show that the joint trial resulted in actual prejudice." *Id.* We also note that there is a "policy of judicial economy which 'favors [the] joint trial of defendants where largely the same evidence would be admitted in separate trials of each defendant.'" *Id.* quoting *United States v. Hattaway,* 740 F.2d 1419, 1424 (7th Cir.1984). In *United States v. Giangrosso,* 779 F.2d 376 (7th Cir.1985), we stated that "the defendant must demonstrate 'more than the fact that a separate trial offer[s] ... a better chance for acquittal.'" *Id.* at 379, *citing United States v. Ras,* 713 F.2d 311, 315 (7th Cir.1983). " 'The general rule is that the persons jointly indicted should be tried together, especially in conspiracy cases.' " *United States v. Madison,* 689 F.2d 1300, 1305 (7th Cir.1982) quoting *United States v. Edwards,* 488 F.2d 1154, 1160 (5th Cir.1974).

Garver and Mohr argue that they were prejudiced because they were tried with Magnuson who was also charged with witness tampering, Count 5. Since Magnuson was found not guilty of the crime charged in Count 5, the government argues that "[n]o prejudice could have inhered from evidence presented on that count."

Garver additionally claims that "[f]rom the onset of the trial there were antagonistic defenses that surfaced between the defendant Magnuson and the defendant Garver." Garver fails to specify which of his defenses were "antagonistic" to Magnuson's defenses. The government points out that Garver and Magnuson presented "no defenses, other than a flat denial of guilt."

Mohr argues that he should have been granted a severance because of the "gross disparity of evidence between Larry Mohr and the other two defendants [Garver and Magnuson]." Mohr maintains that there was a gross disparity in the evidence because he contends that the evidence failed to demonstrate that he was involved in the conspiracy. The government states that, while Mohr "did not personally participate in every overt act," he did "organize the conspirators in a series of meetings; recruit, bribe, and direct Charles Rawlings; and generally oversee the laundering of the bribe money and PRT fee payment checks through his controlled bank, Carmel Bank." Because Garver, Mohr, and Magnuson faced nearly identical charges and the evidence introduced against them at trial was the same as would have been introduced in separate trials, we hold that the defendants were not prejudiced from their joint trial and the trial court properly denied the motions of Garver and Mohr for severance.

## VI

Garver and Mohr finally argue that the evidence was insufficient to sustain their convictions for conspiracy, mail fraud and violation of the RICO statute. In evaluating, the defendants' claims, we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original).

Mohr initially maintains that the evidence was insufficient to sustain his convictions on Counts 3 and 4 of the indictment. Counts 3 and 4 of the indictment alleged that Mohr committed mail fraud in violation of 18 U.S.C. § 1341 [2] through his par-

2. 18 U.S.C. § 1341 states:
   "Whoever, having devised or intending to devise any scheme or artifice to defraud, or

for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, ex-

ticipation in the payment of bribes to public Bayt and Corsaro in order to secure reduction in the 1979 permanent assessment of Merchants Plaza. Mohr asserts that his conviction on Counts 3 and 4 of the indictment should be reversed because Bayt and Corsaro could not identify Mohr at trial. The evidence at trial demonstrated that Mohr was a member of Midwest Appraisers, Inc. as was Garver and Rawlings. Midwest Appraisers, Inc. was employed by PRT to secure a reduction in the 1979 Merchant's Plaza permanent assessment. Garver gave a check to Magnuson the proceeds of which Magnuson used to bribe Bayt. When Midwest Appraisers, Inc. received its fee for securing the reduction of the Merchants Plaza assessment from PRT, Mohr helped launder the funds and distribute money to fund the enterprise through his bank. Mohr not only had knowledge of the conspiracy to bribe Bayt and Corsaro but actively participated in the same.

"To prove a violation of the mail fraud statute, 18 U.S.C. § 1341, the evidence must show a scheme, intent to defraud, and the use of the mails." *United States v. Silva*, 781 F.2d 106, 108 (7th Cir.1986). In *United States v. Silva*, we noted that "the conspiracy doctrines applicable to multi-member fraud scheme provided guidance as to how the first prong of the mail fraud statute should be interpreted." *Id.* We stated that "[a]lthough mere association with conspirators is, standing alone, insufficient to prove participation in the conspir-

acy, a single act is enough evidence if the circumstances permit the inference that the act was 'intended to advance the ends of the conspiracy.'" *Id.* at 109. The evidence demonstrated that Mohr distributed the fees generated from the illegal reduction of the Merchants Plaza permanent assessment as prearranged and proved that Mohr intended to participate in a scheme to defraud the citizens of Marion County, Indiana of the unbiased services of Bayt and Corsaro.

█ Mohr next argues that the evidence was not sufficient at trial to support his conviction on Count 1 of the indictment, conspiracy to commit mail fraud in violation of 18 U.S.C. § 371[3], Count 2, mail fraud in connection with the payment of bribes for the partial reassessment of Merchants Plaza, and Count 6, mail fraud in connection with the Maryland Street Garage assessment. Mohr states that his convictions on Counts 1, 2, and 6 rests solely on the uncorroborated testimony of Rawlings. In *United States v. Silva*, 781 F.2d 106 (7th Cir.1986), we stated "[t]he appellant who argues an evidentiary sufficiency challenge bears a 'heavy burden' to show that the record contains no evidence from which a jury could find guilt beyond a reasonable doubt." *Id.* at 108. The jury found Rawlings' testimony to be credible since it convicted Mohr of the charges. In addition, the jury considered documentary evidence of Mohr's participation in the bribery conspiracy since the government introduced extensive evidence as to the distribu-

change, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than

$1,000 or imprisoned not more than five years, or both."

3.  18 U.S.C. § 371 states:

"If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor."

tion of fees derived in part from Mohr's illegal activities. We are convinced that the evidence presented at trial, specifically Rawlings' testimony and the documentary evidence corroborating his testimony, established that Larry Mohr committed the crimes charged in the indictment. We affirm Mohr's convictions because, after viewing the evidence in the light most favorable to the prosecution, it is clear that any rational trier of fact could have found that Mohr committed the offenses charged in the indictment. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

■ Garver also argues that the evidence presented at trial was insufficient to convict him on Counts 1–4 and 6 of the indictment. However, the evidence that the government introduced at trial demonstrated that Garver participated actively in arranging the bribes of Rawlings, Bayt, and Corsaro. For example, the government proved that Garver gave a check to Magnuson and Magnuson used the proceeds of the check to bribe Bayt. The government also established that Garver paid Rawlings for his illegal activities. In light of all the evidence the government introduced at trial, specifically the evidence proving that Garver bribed Rawlings and gave Magnuson a check to bribe Bayt, we hold that the evidence was sufficient to support Garver's conviction of Counts 1–4 and 6 of the indictment.

■ Both Garver and Mohr contend that the evidence at trial was insufficient to convict them of Count 7 of the indictment, a violation of the RICO statute arguing that the government failed to prove "a 'pattern of racketeering activity'" which is an element of the RICO statute. The Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(a), states:

"(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated, as a princi-

pal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

Section 1961 of the act defines "racketeering activity" as "any act which is indictable under any of the following provisions of title 18, United States Code: ... section 1341 (relating to mail fraud)." 18 U.S.C. § 1961(1)(B). The statute further states that " 'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5).

The evidence presented at trial to support the defendants' conviction of four separate counts of mail fraud in violation of 18 U.S.C. § 1341 committed between 1978 and 1979 was sufficient to establish the "pattern of racketeering" pursuant to the RICO statute because the definitional section of that statute plainly states that racketeering activity is "any act which is indictable ... under ... title 18, United States Code ... section 1341 (relating to mail fraud)." 18 U.S.C. § 1961(1)(B). The prosecution presented evidence at trial proving that Garver and Mohr were guilty on counts 2–4 and 6 of the indictment charging them with mail fraud. Since, as we have already held, the evidence was sufficient to convict Garver and Mohr of four counts of mail fraud, it is obvious that Garver and Mohr committed a series of acts "indictable ... under ... title 18, United States Code ... section 1341 (relating to mail fraud)," 18 U.S.C. § 1961(1)(B), and thus participated in a pattern of racketeering activity.

■ Mohr also contends that there is no direct evidence that he agreed with each of his co-conspirators to bribe public officials

and that he only participated in a legitimate business. In *United States v. Starnes*, 644 F.2d 673, 679 (7th Cir.1981), we stated that "[t]he nature of racketeering connections to an otherwise legitimate business suggests that elements outside a company may assist in obtaining the company's illegal goals." *Id.* at 679. "The substantive proscriptions of the RICO statute apply to insiders and outsiders—those merely 'associated with' an enterprise—who participate directly and indirectly in the enterprise's affairs through a pattern of racketeering activity." *United States v. Elliott*, 571 F.2d 880, 903 (5th Cir.1978). Mohr's contention is meritless because the government proved that Mohr participated in the bribery conspiracy through his laundering of funds and distribution of fees.

## VII

■ Garver also appeals his concurrent three year sentences on Counts 1–4 and 6 of the indictment and concurrent six-year term on Count 7 for violation of the RICO statute. Garver specifically states that his six year sentence for violating the RICO statute was too harsh. Under 18 U.S.C. § 1963(a),[4] Garver could have received a twenty year sentence. In *United States v. Willard*, 445 F.2d 814, 816 (7th Cir.1971), we stated:

> "It is well established that sentencing judges have a wide discretion in determining the appropriate punishment within the limits of various federal statutes and that as a matter of the appellate

court's supervisory control, the exercise of such discretion will not be disturbed on appeal except on a plain showing of gross abuse."

*Id.* at 816. *See also United States v. Ledesma*, 632 F.2d 670, 679 (7th Cir.1980). In his brief, Garver does not point out any gross abuse on the part of the trial judge in sentencing him. Because the record fails to indicate any abuse of discretion on the part of the court in sentencing Garver and since Garver's sentence was within the statutory limits, we hold that Garver's sentence was not excessive.

## VIII

We hold that the trial court properly admitted statements of the defendants' co-conspirators and properly admitted exhibits 32, 32(a), and 32(b) into evidence. The district court's ruling was proper in allowing the government to introduce evidence relating to the payment of fees since that evidence was relevant to the charges in the indictment. The trial court properly denied the defendants' motions for separate trials because Garver, Mohr, and Magnuson faced nearly identical charges and the evidence introduced against them at trial was the same as would been have introduced in separate trials. We hold that the evidence was sufficient to convict Garver and Mohr of the offenses charged in the indictment. Finally, we hold that the six year sentence imposed on Garver by the trial judge was proper because the court did not abuse its

---

**4.** 18 U.S.C. § 1963(a) states:

Whoever violates any provision of section 1962 of this chapter shall be fined not more than $25,000 or imprisoned not more than twenty years, or both, and shall forfeit to the United States, irrespective of any provision of State law—

(1) any interest of the person has acquired or maintained in violation of section 1962;

(2) any—

(A) interest in;

(B) security of;

(C) claim against; or

(D) property or contractual right of any kind affording a source of influence over; any enterprise which the person has established, operated, controlled, conducted, or

participated in the conduct of in violation of section 1962; and

(3) any property constituting, or derived from, any proceeds which the person obtained, directly, or indirectly, from racketeering activity or unlawful debt collection in violation of section 1962.

The court, in imposing sentence on such person shall order, in addition to any other sentence imposed pursuant to this section, that the person forfeit to the United States all property described in this subsection. In lieu of a fine otherwise authorized by this section, a defendant who derives profits or other proceeds from an offense may be fined not more than twice the gross profits or other proceeds.

discretion and because the sentence was within statutory limits.

Accordingly, we affirm the convictions of Mohr and Garver for mail fraud, conspiracy to commit mail fraud, and violating Rico. We also affirm the district court's six-year sentence of Garver for violating RICO.